Beta STEEL, Appellant–Defendant,

v.

Margaret M. RUST, Individually, and Margaret M. Rust, as Administrator of the Estate of Brian L. Rust, Appellee–Plaintiff.

No. 64A03–0407–CV–327.

Court of Appeals of Indiana.

June 30, 2005.

Garrett V. Conover, Bokota Ehrhardt McCloskey Wilson & Conover, P.C., Merrillville, for Appellant.

Thomas F. Macke, Jeffrey S. Wrage, Blachly Tabor Bozik & Hartman, Valparaiso, for Appellee.

## OPINION

BARNES, J.

### Case Summary

Beta Steel ("Beta") appeals the trial court's denial of its motion for summary judgment in Margaret Rust's negligence action against it for the wrongful death of her husband, Brian Rust. We affirm.

### Issues

We restate and reorder the issues before us as:

I. whether there is any evidence Beta owed a duty of due care to Brian, an employee of an independent contractor hired by Beta to perform work at Beta's facility;

II. whether, if such a duty was owed, there is any evidence Beta breached that duty; and

III. whether, if Beta owed a duty to Brian and breached that duty, the alleged negligence of the independent contractor was the intervening cause of Brian's death as a matter of law.

### Facts

Beta contracted with Hyre Electric to complete a project at its steel mill that involved the relocation, in the mill's electrical control room, of certain equipment onto an elevated steel rack. On January 28, 2000, Brian was working above an electrical control cabinet, the top of which is about six feet above the floor, installing and welding part of the steel rack. At some point, he stepped down onto the metal top of the cabinet, which then buckled and came into contact with energized components inside the cabinet. This resulted in Brian's electrocution and death, as well as several explosions in the control room that lasted for three to five minutes before power could be shut off. It is unclear from the designated evidence whether Brian stepped on the cabinet intentionally or inadvertently.

The electrical control cabinet Brian stepped on had been installed at Beta's mill in 1991. There is designated evidence in the record that Phillip Doolittle, an electrical engineer/consultant, advised Beta at the time that its electrical control cabinets lacked ground fault protection, as required by electrical safety regulations, to cut the flow of electricity within a fraction of a second in the event of a problem. Without installing such a system, Doolittle told Beta representatives, they were risking human life and damage to hundreds of thousands of dollars worth of equipment. Doolittle also testified in his deposition that a Beta employee responded to his

recommendation to install a ground fault protection system, "We'll do that later." App. p. 166. However, when Doolittle inspected Beta's electrical control room after Brian's death, he found to his "shock, disbelief, and extreme disappointment" that it had not installed the recommended system. *Id.* at 184. Doolittle also opined that such a system could have prevented Brian's death, and the most that might have happened would have been Brian's being startled by a loud clap and falling to the ground after he stepped on top of the cabinet. Doolittle also stated that all other steel mills in Northwest Indiana "without exception" have ground fault protection systems such as he recommended to Beta *Id.* at 183.

There is also designated evidence in the record that electricians routinely walk on top of metal electrical control cabinets without difficulty in performing their work. Edward McCorkle of Hyre, Brian's foreman, testified in a deposition that in his thirty years as an electrician, every metal electrical control cabinet he was aware of had been strong enough to walk on top of. He also testified, "We work on metal clad switch gear all the time that is energized, and if there was a problem we should have been told." *Id.* at 742.

Brian Green, Beta's Electrical Maintenance Supervisor, was aware that electricians sometimes walked on top of electrical control cabinets to perform their work, and he had done so himself on previous occasions. He also claimed, however, that he had told McCorkle the top of at least one of the particular cabinets in Beta's control room was too weak to be walked on. The specific cabinet Green pointed out to McCorkle was slightly different and located in a different part of the control room from the cabinet Brian later stepped on.

Additionally, there is no evidence Green advised McCorkle of the lack of ground fault protection for the cabinets.

Margaret, individually and as administrator of Brian's estate, sued Beta for negligence in causing his death. She did not sue Hyre or any other party, but Beta did name Hyre as a nonparty defendant in its answer. Beta subsequently moved for summary judgment, which the trial court denied on June 9, 2004. Beta now appeals.[1] Additional facts will be provided as necessary.

### Analysis

Initially, the parties debate the proper appellate standard of review for a trial court's ruling on a summary judgment motion. Neither party disputes the general proposition that summary judgment is appropriate only if the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Gunkel v. Renovations, Inc.,* 822 N.E.2d 150, 152 (Ind.2005). It is also clear that we must construe all facts and reasonable inferences drawn from those facts in favor of the nonmoving party. *Gunkel,* 822 N.E.2d at 152. The review of a summary judgment motion is limited to those materials designated to the trial court and we must carefully review decisions on summary judgment motions to ensure that parties are not improperly denied their day in court. *Id.*

The dispute in this case over the standard of review arises from language in opinions from this court and our supreme court that arguably is inconsistent. It has been said, "The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erro-

---

1. The trial court also denied a motion for summary judgment filed by Margaret. The denial of that motion is not before us on appeal.

neous." *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 908 (Ind.2001); *see also Nance v. Holy Cross Counseling Group,* 804 N.E.2d 768, 771 (Ind.Ct.App. 2004), *trans. denied.* It has also been said, "On appeal from summary judgment, the reviewing court analyzes the issues in the same fashion as the trial court, *de novo.*" *LCEOC, Inc. v. Greer,* 735 N.E.2d 206, 208 (Ind.2000) (emphasis added); *see also Indiana Bell Telephone Co., Inc. v. Time Warner Communications of Indiana, L.P.,* 786 N.E.2d 301, 305 (Ind.Ct.App. 2003). We can understand why the parties might be confused as to how a trial court ruling can be reviewed de novo, while at the same time the appellant has the burden of demonstrating error.

■■ To the extent opinions sometimes say that the appellant bears the burden of persuading the appellate court that the trial court's summary judgment ruling was erroneous, such burden is largely symbolic and nominal. All trial court rulings should be presumed to be correct, but in the context of summary judgment proceedings we will not hesitate to reverse a trial court's ruling if it has misconstrued or misapplied the law, failed to consider material factual disputes, or improperly considered immaterial factual disputes. We also give no deference to a trial court's ability to weigh evidence and judge witness credibility, because no such weighing or judging is permitted when considering a summary judgment motion. *See Gunkel,* 822 N.E.2d at 152. Instead, we view the designated evidence independently and with an eye toward construing it most favorably to the nonmovant. *See id.*

■ Before turning to the merits of this case, we also address Beta's motion to strike several portions of Margaret's appellee's brief. Under Indiana Appellate Rule 42, we "may order stricken from any document any redundant, immaterial, im-pertinent, scandalous or other inappropriate matter." We see no basis to strike any portion of Margaret's brief.

First, Beta contends that Margaret's "Statement of the Case" is argumentative and does not cite to the record. We note that she does cite to the record. On the other hand, we agree that Margaret's "Statement of the Case" goes beyond describing "the nature of the case, the course of the proceedings relevant to the issues presented for review, and the disposition of these issues by the trial court . . . ." Ind. Appellate Rule 46(A)(5). Still, we see nothing grossly inappropriate or impertinent in the "Statement of the Case" and decline to strike it.

■ Second, Beta requests that we strike numerous factual assertions in Margaret's brief because they contain citations to memoranda filed with the trial court, not the designated summary judgment evidence. It would have better facilitated our review if Margaret had cited us directly to the designated evidence in her appellate brief, rather than to her trial court memoranda. As she points out, however, the trial court memoranda that she has cited to in her appellate brief do, in turn, contain citations to the designated evidence that support the factual assertions both in the memoranda and her appellate brief. We decline to strike the factual assertions in Margaret's brief.

■ Third, Beta specifically requests that we strike portions of Margaret's brief that refer to the deposition of Doolittle, the electrical engineer who opined that Brian's death might have been prevented had Beta installed an adequate ground fault protection system for the electrical control cabinet. Beta argues on appeal that this effectively constituted a medical opinion and Doolittle was not qualified to provide such an opinion. Beta contends

that it objected to Doolittle's testimony on this point during his deposition; however, it directs us to nothing in the record demonstrating that it asked the trial court to rule on this objection, nor requesting that it strike this portion of Margaret's designated summary judgment evidence based on Doolittle's alleged lack of expertise to provide such an opinion. We decline to strike Margaret's reliance on this portion of Doolittle's deposition, finding any argument on this point to be waived.[2] *See Paramo v. Edwards,* 563 N.E.2d 595, 600 (Ind.1990).

◼ Fourth, Beta takes issue with a footnote in Margaret's brief that compares Beta's characterization of some of the designated evidence to "the Wizard of Oz whose presence is uncovered by Toto but continues to shout into the microphone: 'Pay no attention to the man behind the curtain!'" Appellee's Br. p. 5 n. 2. This is a unique characterization of an opposing party's position, but not one that we can label "scandalous," "impertinent," or "immaterial." We do not automatically condemn an attempt to place some light humor into a brief, albeit at the expense of opposing counsel, and decline to strike the footnote.

◼ Finally, Beta objects to footnote seven on pages fourteen and fifteen of Margaret's brief. That footnote contains references to statistics regarding accidental deaths in the United States, including those attributable to electricity; as Beta contends, these statistics were not designated to the trial court. Margaret notes, however, that the footnote was added in response to Beta's assertion, on page thirteen of its brief, alleging that "[t]his Court can take judicial notice that welding occurs literally thousands of times per day in the workplace without injury." Footnote seven in Margaret's brief is simply a demonstration of why it would be improper to take judicial notice of Beta's alleged fact regarding the safety of welding, particularly under the facts present in this case. We decline to strike footnote seven of Margaret's brief.

◼ Turning now to the merits, we note the three elements of the tort of negligence: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach. *Rhodes v. Wright,* 805 N.E.2d 382, 385 (Ind.2004). Summary judgment is rarely appropriate in negligence cases. *Id.* at 387. "This is because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person— one best applied by a jury after hearing all of the evidence." *Id.*

## I. Duty

Beta first contends that it owed no duty of care to Brian, an employee of an independent contractor working on its premises. Part of Beta's brief discusses the general proposition that a principal cannot be held vicariously liable for the negligence of an independent contractor, subject to five exceptions. *See Merrill v. Knauf Fiber Glass GmbH,* 771 N.E.2d 1258, 1267 (Ind. Ct.App.2002), *trans. denied.* Margaret, however, has not sought to hold Beta vicariously liable for any negligence of Hyre, the independent contractor employer of Brian. Her complaint specifically, and only, seeks to hold Beta liable for its own

---

**2.** In any event, one would hope that an electrical engineer is qualified to have some knowledge of the dangers to humans of electricity. In fact, it is conceivable such an expert may have more specific knowledge of such dangers than the average medical doctor. Because Beta failed to argue before the trial court that Doolittle was unqualified, however, Margaret had no opportunity to establish his credentials in this regard.

negligence. Therefore, we need not address the general rule precluding a principal's liability for the negligence of an independent contractor and the five exceptions to that rule.

As for Beta's own alleged negligence, an owner of property generally does not have a duty to furnish the employees of an independent contractor a safe place to work to the extent that an employer is required to do so. *See id.* at 1264. The owner nonetheless is under a duty to keep the property in a reasonably safe condition for business invitees, including employees of independent contractors. *Id.* at 1265. The landowner in such case has an affirmative duty to exercise ordinary care to keep his property in a reasonably safe condition coextensive with the purpose and intent of the invitation. *Howard v. H.J. Ricks Const. Co., Inc.,* 509 N.E.2d 201, 205 (Ind.Ct.App.1987), *trans. denied.*

Despite this language regarding a property owner's duty toward employees of an independent contractor, Beta asserts that it did not owe a duty to Brian in this case because it had ceded control of the electrical control room to his employer, Hyre, at the time and place of the accident. "In premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred." *Rhodes,* 805 N.E.2d at 385. The rationale behind this rule "is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm." *Id.* "Generally, whether a duty exists is a question of law for the court to decide." *Id.* at 386. Sometimes, however, the existence of a duty depends upon underlying facts that require resolution by the trier of fact, and this may include questions regarding who controlled prop-

erty at the time and place of an accident. *See id.* Possession and control of property for premises liability purposes has been described as a question of fact involving occupation and intent to control the particular area where the injury occurred. *Crist v. K–Mart Corp.,* 653 N.E.2d 140, 145 (Ind. Ct.App.1995).

Beta argues in part, regarding its agreement with Hyre, that Beta retained no "material measure of control over the work area or the safety procedures employed by Hyre Electric." Reply Br. p. 9. Beta also contends that the parties had agreed that Hyre was responsible for identifying any equipment in the electrical control room that needed to be de-energized, and Hyre had not requested that the cabinet Brian stepped on be de-energized. To the extent Beta seems to be arguing that its contract with Hyre circumscribed its common law tort duty to Brian, it cannot do so. "A person cannot limit his or her tort law duty to third parties by contract." *Rhodes,* 805 N.E.2d at 385 (holding that this court erred in relying on contract between property owner and contractor as indicating that contractor had control over property at time and place of accident). In any event, Beta's arguments in this regard are based in large part on documents executed by Hyre on February 7, 2000, or several days after Brian's death. Beta claims the procedures outlined by these documents were actually in effect on January 28, 2000, but whether that was the case clearly would be an issue of fact for a jury to decide.

Aside from whatever agreement Beta and Hyre had regarding the work to be performed, other designated evidence in this case demonstrates, at a bare minimum, the existence of a fact question to be decided by a jury regarding whether Beta or Hyre controlled the property at the

time and place of Brian's death. Although Hyre had effectively taken over the electrical control room at the time of Brian's death and purportedly controlled how the work would be performed, Beta had been fully responsible for the installation of the electrical control cabinet on which he stepped. The nature of the job requested by Beta required persons to work in close proximity to and above this cabinet. There is designated evidence that the cabinet was faultily designed and installed. Beta clearly had superior knowledge regarding the injuring instrumentality in this case, i.e. the electrical control cabinet.

Thus, even if Beta no longer controlled the electrical control room as a whole at the time of the accident or controlled the manner of Hyre's work, there is evidence that it was in a better position than Hyre to prevent the harm that occurred in this case and could be found to have owed a duty to Brian, consistent with the rationale behind the rule regarding control of the premises. This is clearly taught by our supreme court in *Rhodes*. That case concerned late-night chicken catching at a farm, where an employee of Tyson Chicken was killed when he was crushed by a forklift in the dark. Our supreme court held that even if the evidence in that case demonstrated that Tyson controlled the premises at the time and place of the death of its employee, it would not automatically relieve the farmer-landowner of responsibility for the death. *Id.* This was because the landowner always controlled the external lighting, or lack thereof, on the farm, and such lack of lighting, which was unusual in the chicken farming industry, was one of the claimed causes of the employee's death. *Id.*

Here, likewise, Beta had complete control over the design and installation of the faulty electrical control cabinet, which was non-standard in the electrical and steel industries, that allegedly killed Brian. Furthermore, the inherent dangerousness of the cabinet was much less obvious than was the lack of lighting in *Rhodes*. It does not appear to us that Indiana law allows a landowner to create a latent, nonobvious danger on its premises, then escape liability for an injury caused by that danger simply because the injured party was the employee of an independent contractor who happened to be controlling the site at the time of the accident. We cannot say as a matter of law that Beta owed no duty to Brian, given that the nature of the work it requested of Hyre required Hyre's employees to work in close proximity to dangerous levels of electricity. Beta is not entitled to summary judgment on the basis of lack of duty.

## II. Breach

Beta next contends that, as a matter of law, it did not breach any duty of care it owed to Brian. Specifically, it contends that it discharged any such duty when Green, Beta's Electrical Maintenance Supervisor, pointed out to McCorkle, Brian's foreman at Hyre, the construction of an open electrical control cabinet in the control room, indicated that the metal on top of it was not sturdy enough to walk on, and noted the proximity of the buss bars to the top of the cabinet. This particular cabinet was different from and located in a different part of the control room from the cabinet on which Brian later stepped.

Under the Second Restatement of Torts, adopted in Indiana on this point, a landowner is subject to liability if: (1) the landowner knows or should know of a danger and should realize it involves an unreasonable risk; (2) should expect that invitees will not realize the danger or will not protect themselves against such; and (3) fails to exercise reasonable care to protect invitees against the danger. *Merrill*, 771 N.E.2d at 1265. "[A] landowner is

liable for reasonably foreseeable injuries to a contractor's employee caused by hazardous instrumentalities maintained by the landowner on the landowner's premises." *Zawacki v. U.S.X.*, 750 N.E.2d 410, 414 (Ind.Ct.App.2001), *trans. denied.* It has also been held that a landowner's warning of a danger to the supervisor of a business invitee-independent contractor employee constitutes notice to the employee himself. *See Merrill*, 771 N.E.2d at 1265.

At the outset, we note that Beta presents Green's testimony regarding his warning to McCorkle as an undisputed material fact. It is not at all clear to us that it is undisputed. McCorkle's own deposition testimony fails to reveal that the alleged conversation with Green ever took place. McCorkle was specifically asked, "Prior to the accident did you have any knowledge, sir, how the components were configured inside of those cabinets?" McCorkle responded, "No, no, I had never been in that line—the incident happened I had never been in that before or knew nothing of the circuitry of it." App. p. 758.

To the extent McCorkle and Green might have had a conversation of some sort along the lines Green suggested, according to McCorkle's testimony it was not effective in warning him of the extent of the danger presented by all of the electrical control cabinets in the control room. As he testified, "We work on metal clad switch gear all the time that is energized, and if there was a problem we should have been told." App. p. 742. "It is just a norm in the electrical industry that you can work around that equipment without it being de-energized, that is why it is a metal clad switch gear, all the exposed parts are protected." App. p. 684. "We as an outside contractor can't walk into somebody's mill and know the unknown hazards.... [W]e do know that there is exposure, known exposure, we know that.

Other than that we rely on the company to let us know what the unknown hazards are." App. p. 673.

■ Even if Green had had precisely the conversation with McCorkle he said he had, there still is designated evidence in the record that would support a jury finding that Beta could have done more in this case in the exercise of reasonable care. In the present case, the danger posed the electrical control cabinets was extreme: one wrong step by a person working above them could, and did, lead to instant death. The extremity of the danger was caused by Beta's knowing failure to install a ground fault protection system for the cabinet, as recommended by at least one electrical engineer and electrical safety regulations. The extreme danger presented by the cabinet was not standard in the industry, and McCorkle indicated that he would not expect stepping on top of such a cabinet to present any danger. Beta was aware that electricians stepped on top of such cabinets, was aware that the work they requested of Hyre would require working directly above such cabinets, was aware of their flimsy tops, and was aware of their lack of ground fault protection.

The inability of the cabinet tops to withstand the weight of a person standing on it is only part of the story, and part of the danger the cabinet posed. Another critical part of the danger, according to Doolittle's deposition, is Beta's willing failure to install an adequate ground fault protection system for the cabinets, in contravention of both Doolittle's advice and electrical safety regulations. Even assuming Brian knew, or should have known from McCorkle, that the tops of the cabinets might not hold his weight, according to Doolittle his death might have been avoided if an adequate ground fault protection system had been

installed.[3] There is no designated evidence, disputed or otherwise, that Beta ever advised anyone at Hyre of the lack of ground fault protection, nor that it recommended that cabinets in the control room that persons would be working near be de-energized. Green also did not specifically advise that all of the electrical control cabinets in the control room were constructed in the same way as the cabinet he pointed out to McCorkle.

Given the extent of the danger, Beta's superior knowledge regarding the extent of the danger, and its knowledge that Hyre's employees would be working in close proximity to that danger, a jury could find that Beta could have done more in this case to fulfill its duty of care to Brian with respect to warning of the danger and that such measures would not have been unduly burdensome to Beta or unreasonable. We cannot say as a matter of law that Green's conversation with McCorkle, even if its existence and content are undisputed, was sufficient to discharge any duty to Brian.

 Aside from warning of the danger, a jury could find that Beta could have done more with respect to making the electrical control cabinets safer. "Indiana case law recognizes that electricity is a dangerous force. Anyone utilizing this force owes a duty to exercise reasonable care to prevent injury to children who are likely to come in contract with it." *Petroski v. Northern Indiana Public Service Co.*, 171 Ind.App. 14, 20, 354 N.E.2d 736, 742 (1976). *Petroski* specifically refers to children because the case concerned a child who climbed a tree and touched an uninsulated power line. It is logical to conclude that users of powerful amounts of electricity also owe a duty of care to adults who might reasonably be expected to come into contact with it. Beta attempts to divert attention from electricity's inherent dangerousness by pointing out that Brian was not actually performing electrical work, only welding, at the time of his death. The important fact here, however, is where Brian was performing the welding—in close proximity to lethal levels of electricity contained in nearby cabinets.

 There is designated evidence in this case, albeit disputed, that the manner in which Beta installed the electrical control cabinets without ground fault protection in 1991 violated Indiana administrative regulations regarding electricity in effect at the time.[4] Violation of an ad-

---

3. This fact alone distinguishes this case from *Merrill*. There, a landowner hired an independent contractor to perform roofing work on a building. The landowner warned the independent contractor that some of the skylights on the roof were uncovered, and a representative of the landowner in fact pointed out each uncovered skylight to the independent contractor. An employee of the independent contractor later fell through one of the skylights while walking on the roof. We held that the landowner's warning regarding the skylights was sufficient to absolve it of liability for the accident as a matter of law. *Merrill*, 771 N.E.2d at 1266–67. Here, the nature and extent of Green's warning to McCorkle appears to be disputed. Additionally, while an open skylight presents an obvious danger to a person working around one on a roof, there is no evidence that the extent of danger posed by the electrical control cabinets in Beta's control room, caused by the lack of a ground fault protection system, was known to Hyre or McCorkle.

4. Beta designated some evidence that the regulations at issue were not yet in effect when the cabinets originally were installed. The confusion over what regulations were in effect at that time may stem from the manner in which electrical safety regulations are created. The National Fire Protection Association periodically drafts a National Electric Code every few years, which subsequently is adopted by the Indiana Fire Prevention and Building Safety Commission as the Indiana Electrical Code, subject to some modifications. *See* 675 Ind. Admin. Code 17–1.6–1.

ministrative regulation generally can be considered evidence of negligence for a jury to consider, though it is not negligence per se. *Zimmerman v. Moore,* 441 N.E.2d 690, 696 (Ind.Ct.App.1982). Additionally, even if Beta was not technically in violation of the Indiana Administrative Code at the time the cabinets were installed in 1991, there still is evidence that it intentionally disregarded an electrical engineer's advice regarding the importance of a ground fault protection system, and such disregard was highly unusual for the steel industry, which disregard could also be evidence of a breach of duty on Beta's part.

Beta also claims that Margaret's reliance on Indiana regulations and the National Electric Code as evidence of negligence is improper because she has failed to argue or establish that they were intended to create a private cause of action for a person allegedly injured as a result of a violation of those rules, citing to *Vaughn v. Daniels Co. (West Virginia), Inc.,* 777 N.E.2d 1110 (Ind.Ct.App.2002), *trans. pending. Vaughn* differs from the present case, in that the question before us there was whether certain coal mining regulations imposed a duty on a defendant for the benefit of a plaintiff, and thus created a private cause of action. *Id.* at 1133–34. We have already concluded that there is sufficient designated evidence that Beta may have owed a duty to Brian under traditional common law principles of premises liability. It is unnecessary to turn to the Indiana Administrative Code or the National Electric Code to establish a duty on Beta's part for Brian's benefit or to establish the existence of a cause of action for Margaret. Evidence of violations of such rules, however, is relevant to the

question of whether Beta breached any such duty and may be considered by a jury in that regard. In sum, there is sufficient designated evidence in the record that Beta may have breached a duty owed to Brian.

### III. Causation

Beta's final argument is that Hyre's negligence was an intervening cause of Brian's death and, therefore, any negligence of its own was not the proximate cause of the death. Our supreme court has summarized as follows:

> The doctrine of superseding or intervening causation has long been part of Indiana common law. It provides that when a negligent act or omission is followed by a subsequent negligent act or omission so remote in time that it breaks the chain of causation, the original wrongdoer is relieved of liability. A subsequent act is "superseding" when the harm resulting from the original negligent act "could not have reasonably been foreseen by the original negligent actor." Whether the resulting harm is "foreseeable" such that liability may be imposed on the original wrongdoer is a question of fact for a jury.

*Control Techniques, Inc. v. Johnson,* 762 N.E.2d 104, 107 (Ind.2002) (internal citations and footnote omitted). This doctrine has survived the adoption of the Indiana Comparative Fault Act. *See id.* at 110. Ultimately, however, "the doctrine in today's world adds nothing to the requirement of foreseeability that is not already inherent in the requirement of causation." *Id.* at 108.

The *Johnson* court plainly stated that the question of intervening causation is one for a jury to decide. *Id.* at

---

Thus, it is possible that when Beta installed the cabinets in 1991, the National Electric Code provided for a stricter set of standards that had not yet technically been adopted in Indiana.

107. We see no reason to depart from that principle here. Beta argues that Hyre was negligent in failing to provide a scaffold for Brian to work on above the electrical control cabinets, in failing to de-energize those cabinets, and in ignoring Green's alleged advice about the cabinets, and that such negligence superseded any negligence on Beta's part regarding the initial installation of the cabinets without a ground fault protection system. Again, Beta's argument rests primarily on the assumption that Green's warning was given precisely as he said it was given, and we reiterate that the existence, clarity, and efficacy of this warning clearly appears to be a question of fact for a jury to address. Additionally, a jury might reasonably conclude that Hyre's failure to request that the cabinet above which Brian was working be de-energized, or to provide more protection for its workers above the electrical control cabinets, stemmed at least in part from Beta's negligent failure to disclose adequately the extreme dangerousness of the cabinets.

As for Beta's alleged negligence in the initial installation of the cabinets, the fact that such occurred in 1991 and Brian was not killed until 2000 is not an indication that its original negligence was too remote from the harm that ultimately resulted from it. According to Doolittle's deposition, Beta was specifically warned in 1991 that failing to install a ground fault protection system was highly dangerous and in violation of national and state standards. In other words, a jury could find that, despite the passage of time, what happened to Brian in 2000 was reasonably foreseeable by Beta as the original negligent actor in 1991, such that any alleged negligence of Hyre in 2000 is not necessarily the intervening cause of Brian's death as a matter of law. *See id.*

Finally, we note, as the trial court did, that the Comparative Fault Act may lead a jury to assign percentages of fault for Brian's death to both Beta and Hyre. Depending on the evidence presented at trial, it might even decide to assign some fault to Brian himself, or to completely absolve Beta of liability. The designated evidence on Beta's summary judgment motion, however, does not establish that it is entitled to judgment as a matter of law of the question of proximate causation. "[L]iability may not be imposed on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission." *Id.* at 108. Here, there is sufficient designated evidence that death by electrocution was a reasonably foreseeable result of Beta's original negligence in installing the cabinets, particularly when it requested Hyre's employees to perform work in close proximity to the cabinets such that one false step onto one of them would result in instant death.

## Conclusion

The designated evidence fails to demonstrate that Beta is entitled to judgment as a matter of law on Margaret's negligence claim with respect to duty, breach, or causation. The trial court properly denied Beta's motion for summary judgment. We affirm.

Affirmed.

KIRSCH, C.J., and BAKER, J., concur.