**SWAN LAKE HOLDINGS, LLC,**
Appellant–Defendant,

v.

**Dean HILES and Denielle Hiles [1],**
Appellees–Plaintiffs.

No. 50A05–0709–CV–522.

Court of Appeals of Indiana.

June 10, 2008.

1. The trial court's judgment and the record on appeal refer to "Denielle," whereas the complaint and answer refer to "Danielle." Denielle testified but did not spell her name. We have followed the spelling used in the trial court's judgment.

Joseph M. Dietz, Meils Thompson Dietz & Berish, Indianapolis, IN, Attorney for Appellant.

Milford M. Miller, Edward L. Murphy, Jr., Miller Murphy, LLP, Fort Wayne, IN, Attorneys for Appellees.

## OPINION

CRONE, Judge.

### Case Summary

Swan Lake Holdings, LLC ("Swan Lake"), appeals the denial of its motion for judgment on the evidence and the jury's verdict finding it thirty-five percent at fault on the premises liability complaint filed by Dean and Denielle Hiles. We affirm.

### Issues

Swan Lake raises three issues, which we restate as follows:

I. Whether the trial court erred in denying its motion for judgment on the evidence;

II. Whether Swan Lake waived its claim that the trial court abused its discretion in giving jury instruction number five; and

III. Whether the trial court abused its discretion in giving jury instruction number six.

### Facts and Procedural History

The evidence most favorable to the Hileses, the nonmoving parties, follows. Swan Lake is a golf resort in Plymouth, Indiana, consisting of golf courses, indoor and outdoor driving ranges, a hotel and convention center, an indoor pool, sauna, workout center, and various other buildings. One of these buildings, known as the Golf Academy, has a fiberglass panel overhang ("the Overhang") on one side that shelters golfers as they hit golf balls onto an outdoor driving range. A storm blew off some of the Overhang's fiberglass panels, and Swan Lake hired Ancon Construction, Dean Hiles's employer, to replace the fiberglass panels.

The Overhang is more than one hundred feet long and covers an area of several thousand square feet. It is constructed of fiberglass panels measuring twelve feet by three feet screwed to purlins measuring two inches by four inches. The Overhang consists of two portions: part of it was built in 1991 ("the Original Overhang"), and part of it was added at some unknown

time ("the Extension").[2]

Neither the Original Overhang nor the Extension conformed to the blueprints, which called for the purlins to be placed on edge (vertically) and spaced two foot on center. Tr. at 101. Instead, the purlins were placed flat (horizontally). Also, the purlins were placed three foot on center in the Original Overhang and were spaced two and one-half foot on center in the Extension. *Id.*

Approximately one week before repairs were to be made, Ancon Construction carpentry foreman James Bushong walked under the Overhang to determine how many fiberglass panels would be needed. On September 11, 2003, Hiles and Bushong spent five or six hours repairing the Overhang. They used a ladder placed against the edge of the eave side of the Overhang to gain access to the top. In accord with industry practice, they used walk boards to reach the areas where fiberglass panels needed to be replaced. The walk boards were two inches by twelve inches and were twelve to fourteen feet long. In the areas of the Overhang where the fiberglass panels had been blown away, Bushong noticed that some of the purlins had suffered some dry rot. *Id.* at 57. When the job was finished, Bushong, who was farther from the ladder, slid his walk board over the eave and climbed down the ladder. Hiles picked up the last walk board and moved toward the edge of the roof on the Original Overhang, near the Extension. He stepped on a purlin, an accepted industry practice, and it completely separated from its supporting

members at each end. Hiles fell to the ground and was injured.

On December 8, 2004, the Hileses filed a complaint against Swan Lake alleging that the collapse of the Overhang was due to Swan Lake's negligence.[3] Appellant's App. at 13–18. A jury trial was held on July 17, 18, and 19, 2007. At the close of the Hileses' case in chief, Swan Lake moved for a directed verdict, which the trial court denied.

The jury found that Dean and Denielle sustained total damages of $1,300,000 and $11,375 respectively and that Swan Lake was thirty-five percent at fault. Appellant's Br. at 45. After the reduction for comparative fault, the jury awarded Dean a verdict of $455,000 and Denielle a verdict of $3,979.50. *Id.* Swan Lake appeals. Additional facts will be provided as necessary.

## Discussion and Decision

### *I. Judgment on the Evidence*

■ Swan Lake contends that the trial court erred in denying its motion for directed verdict. A directed verdict is also known as a judgment on the evidence and is governed by Indiana Trial Rule 50, which provides,

> Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

---

2. There is no evidence in the record as to when Swan Lake took ownership of the golf resort. John Kindig, Swan Lake's controller at the time of Hiles's accident, was not aware of anyone at Swan Lake who would have knowledge of the construction of the Overhang. Tr. at 33.

3. The Hileses also named John Mast Construction, Inc., as a defendant, but on November 8, 2005, it was dismissed with prejudice by stipulation of the parties. Appellant's App. at 24.

■ Our review of a ruling on a motion for judgment on the evidence is governed by the same standard as that which the trial court applied. *Cavens v. Zaberdac*, 849 N.E.2d 526, 529 (Ind.2006). "The court looks only to the evidence and the reasonable inferences drawn most favorable to the nonmoving party and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case." *E. Chicago Police Dep't. v. Bynum*, 826 N.E.2d 22, 31 (Ind.Ct.App.2005), *trans. denied* (2006). In other words, we "must determine whether there was evidence of probative value supporting each element which would justify submission of the claim to the jury." *S.E. Johnson Co. v. Jack*, 752 N.E.2d 72, 78 (Ind.Ct.App.2001).

> Judgment on the evidence in favor of the defendant is proper when there is an absence of evidence or reasonable inferences in favor of the plaintiff upon an issue in question. The evidence must support without conflict only one inference which is in favor of defendant. If there is any probative evidence or reasonable inference to be drawn from the evidence or if there is evidence allowing reasonable people to differ as to the result, judgment on the evidence is improper.

*Sipes v. Osmose Wood Preserving Co.*, 546 N.E.2d 1223, 1224 (Ind.1989) (quoting *Jones v. Gleim*, 468 N.E.2d 205, 206–07 (Ind.1984)).

■ At trial, the Hileses sought to recover damages from Swan Lake for Dean's injuries under a premises liability theory. Generally, an owner of property is under no duty to provide an independent contractor with a safe place to work. *Zawacki v. U.S.X.*, 750 N.E.2d 410, 414 (Ind.Ct.App.2001), *trans. denied* (2002). "However, the owner has a duty to maintain the property in a reasonably safe condition for business invitees, including employees of independent contractors." *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1264–65 (Ind.Ct.App.2002), *trans. denied; Zawacki*, 750 N.E.2d at 414.

■ The parties agree that this case is governed by Section 343 of the Restatement (Second) of Torts, which reads,

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Our supreme court has clarified the application of Section 343 with regard to independent contractors, holding that "a landowner ordinarily has no liability to an independent contractor or the contractor's employees for injuries sustained while addressing a condition as to which the landowner has no superior knowledge." *PSI Energy, Inc. v. Roberts*, 829 N.E.2d 943, 961 (Ind.2005), *clarified on reh'g*, 834 N.E.2d 665, *abrogated on other grounds by Helms v. Carmel High Sch. Vocational Bldg. Trades Corp.*, 854 N.E.2d 345 (Ind.2006).

Citing *Roberts*, Swan Lake contends that judgment on the evidence was proper because there is no evidence that its knowledge of the danger of the Overhang was superior to Ancon's. In that case, Roberts worked as an insulator for independent contractor Armstrong Contracting and Supply Company ("ACandS"). Roberts worked with insulation containing as-

bestos from 1956 until his employer stopped using it in the early 1980's. PSI hired ACandS, and Roberts often worked in PSI's generating stations. Roberts developed mesothelioma in 2001. Roberts sought damages from PSI and sixty other defendants, including both manufacturers of asbestos and other landowners. The case was tried to a jury. PSI moved for judgment on the evidence at the close of Roberts's case and again at the close of all the evidence. The trial court denied both motions and submitted the case to the jury. The jury allocated fault of thirteen percent to PSI and twelve percent to Roberts, with the remaining seventy-five percent allocated to nonparties, including thirty-six percent to ACandS.

PSI appealed, but our supreme court upheld the judgment of the trial court. In so holding, the supreme court acknowledged that although the jury was provided with an instruction that was taken from Section 343 of the Restatement (Second) of Torts, with immaterial editorial changes, the instruction was "not an accurate statement of the law in that it allows liability to an independent contractor's employee to be imposed upon a landowner when the employee is addressing a condition as to which the landowner has no superior knowledge." *Id.* at 962. Nevertheless, PSI did not challenge the instruction, and "[e]ven erroneous instructions require affirmance if there is no objection at trial and the facts support recovery under the instructions." *Id.* (citing *Picadilly, Inc. v. Colvin,* 519 N.E.2d 1217, 1221 (Ind.1988) and Ind. Trial Rule 51(C)). The *Roberts* court concluded, "On this record, the jury could find that PSI met all of the conditions: PSI had knowledge of the hazard, knew ACandS employees were taking no action to protect themselves, and did nothing. These facts would be sufficient under these instructions to sustain the jury's verdict." *Id.*

Swan Lake concedes that the jury instruction in *Roberts* is "essentially the same" as final instruction four in this case, Appellant's App. at 117, to which it did not object, but it argues, "There is no evidence Swan Lake knew anything about the rot on the roof boards until after the incident when it was learned Bushong had discovered it." Appellant's Br. at 26. In other words, Swan Lake argues that the evidence does not show that it had actual or constructive knowledge that the Overhang contained rotten purlins as required by subsection (a) of Section 343. In support, it cites *Wellington Green Homeowners' Ass'n v. Parsons,* 768 N.E.2d 923 (Ind.Ct. App.2002), *trans. denied.*

In *Parsons,* the plaintiff was a mailman who was injured when a multi-unit mailbox fell after he attempted to open the mailbox with his key. The evidence indicated that the mailbox had been attached by screws placed in the plasterboard, not the wall studs. Upon appeal, the *Parsons* court held that the trial court had erred in denying the defendants' motion for judgment on the evidence, stating:

> With regard to the condition of the property, a landowner's duty of care to an invitee is a known or should have known standard. In the present case, there was no evidence that the Appellants knew or should have known about the defect that allegedly caused Parsons' injuries. Further, there was no evidence that, even if Bailey [the defendants' maintenance technician] had jiggled the multi-box mailbox, he would have discovered the defect.

*Id.* at 929 (citations omitted). The court then concluded that the plaintiff had failed to establish the duty element of his negligence claim in that there was no evidence that the defendants knew, or by the exercise of reasonable care would have discov-

ered, the condition that the plaintiff alleged caused his injuries. *Id.*

*Parsons* is distinguishable from the case at bar. Here, Bushong, who had been a carpenter for thirty-three years, testified that the rotten purlins were an indication that the roof had been leaking for "at least a year or so." Tr. at 58. He opined that it would have been obvious to any owner of the property that the roof had been leaking for a period of time. *Id.* at 58–59. He also testified that in order to see any rotten purlins, the fiberglass panels would need to be removed, but that the panels would not need to be removed to know whether the Overhang was leaking. *Id.* at 81. Finally, he testified that the fiberglass panels would not need to be removed to see that the wood was unpainted and that "if the roof leaks and you've got unpainted wood, sooner or later that's going to weaken the wood." *Id.* at 81–82.

We observe that the specific purpose of the Overhang is to shelter golfers from the rain, and therefore it is reasonable to infer that golfers used the Overhang when it was raining and noticed that it was leaking. In addition, a golf resort like Swan Lake has staff, such as golf instructors, who would have occasion to interact with golfers under the Overhang, and consequently the staff would have had opportunity to observe the Overhang leaking. Given Bushong's testimony and the specific function of the Overhang, we conclude that there is evidence upon which reasonable people could conclude that Swan Lake knew or by the exercise of reasonable care would have discovered that the Overhang had been leaking for over a year, which would indicate that a dangerous condition existed with respect to the Overhang.[4] Accordingly, the evidence here was sufficient under the jury instructions to support each element of the Hileses' claim.

Swan Lake also argues that it exercised no control over the manner in which Hiles replaced the fiberglass panels and therefore breached no duty, citing *Daisy v. Roach*, 811 N.E.2d 862 (Ind.Ct.App.2004). There, Roach hired Daisy's employer, Prosser Construction ("Prosser"), to perform construction work on his home. Roach acted as his own general contractor on the project. Daisy was working on the roof, and someone had moved the ladder. Daisy's supervisor told another worker to put the ladder back up against the house so that Daisy could get down. Daisy start-

---

4.  Swan Lake also cites *Wingett v. Teledyne Industries*, 479 N.E.2d 51 (Ind.1985). In that case, Wingett filed suit against Teledyne for injuries he suffered when a ductwork he was sitting on fell while he was performing demolition work in a foundry. The fallen segment had been improperly connected to the others. On appeal from the grant of Teledyne's motion for summary judgment, the *Wingett* court determined that Teledyne owed no duty to Wingett. The *Wingett* court noted that Teledyne did not specify the method of removal; that no Teledyne employees were present while the work was being done; and that the independent contractor had control of the site and direct supervision of Wingett. *Id.* at 55. Moreover, there was no evidence that Teledyne had inspected the ductwork to discover the nature of the connection, nor was there evidence that the ductwork was dangerous or unsafe when used for its intended purpose. *Id.* The court concluded that there was "no evidence to indicate Teledyne had actual or constructive knowledge of any danger superior to that of appellant." *Id.* We observe that the *Wingett* court considered whether Teledyne had superior knowledge to determine whether it owed a duty to Wingett. However, subsequent case law has clarified that "superior knowledge" should not be a consideration in determining whether the landowner owed a duty, but rather a consideration only in determining whether the landowner has breached that duty. *Zawacki*, 750 N.E.2d at 415 (citing *Douglass v. Irvin*, 549 N.E.2d 368, 370–71 (Ind.1990)). Nevertheless, *Wingett* is distinguishable from this case in that there is evidence to support an inference that Swan Lake had actual or constructive knowledge of the condition of the Overhang.

ed to climb down the ladder, but the ladder slid on ice on the frozen ground, and Daisy fell. Daisy filed a negligence claim against Roach asserting that he was liable as a general contractor, and alternatively, under a premises liability theory. Roach moved for summary judgment, which was granted, and Daisy appealed.

With regard to premises liability, the *Daisy* court held that summary judgment was properly granted because

> At the time of the accident in February, the ground was frozen and icy, a naturally occurring condition during the winter months in northern Indiana. And while those conditions may have contributed to the accident, they were not the cause. *The cause of the accident was the failure of Prosser employees to safely secure the ladders they used to climb onto the roof of the house.* There is no assertion that Roach had any control over the manner in which the ladders were used. While it may be true that Roach had ordered the workers to shut the doors to the home, obtain supplies, and generally directed how he wanted the house constructed, the evidence does not support the conclusion that Roach was in control of the manner in which the ladders were used. Rather, the only conclusion available from the facts before us is that Prosser controlled the use of the ladders on the site and the area where the accident occurred at the time it occurred.

*Id.* at 867 (emphasis added) (footnote omitted).

*Daisy* is inapposite. In the case at bar, the fact that Swan Lake had no control over the manner in which Hiles performed his services is not dispositive because there is evidence of probative value to support a finding that the rotten purlins were a cause of Hiles's fall. We conclude that the trial court properly denied Swan Lake's motion for judgment on the evidence.

## II. Instruction Number Five

■ During final instruction arguments, the Hileses tendered instruction number five, which reads as follows: "As the owner of the land and buildings on the land, only the Defendant can remedy hazardous conditions which exist. The party in control of the land has the exclusive ability to prevent injury from occurring." Appellant's App. at 117. On appeal, Swan Lake contends that the instruction misquotes its source, *Reed v. Beachy Construction Corp.*, 781 N.E.2d 1145, 1149 (Ind.Ct.App. 2002), *trans. denied* (2003). However, at trial Swan Lake objected that the instruction was duplicative and that roofing is not a hazardous activity, citing *Red Roof Inns, Inc. v. Purvis*, 691 N.E.2d 1341 (Ind.Ct. App.1998), *trans. denied.*[5] Tr. at 405. Thus, the argument Swan Lake presents on appeal is not at all similar to the objections Swan Lake made to the trial court. "Any error regarding an instruction is waived where grounds asserted on appeal differ from those stated in objections at

5. In *Red Roof,* this Court was called upon to examine a claim of negligent hiring of an independent contractor pursuant to Section 411 of the Restatement (Second) of Torts. The plaintiff sought to impose liability on Red Roof by means of one of the exceptions to the general rule that a principal is not liable for the negligence of an independent contractor; that exception being "where the act to be performed will probably cause injury to others unless due precaution is taken." 691 N.E.2d at 1344. We held that "[t]he nature of the roofing project in this case did not create the type of danger so as to create a non-delegable duty in Red Roof on the basis that the act to be performed would probably cause harm to others." *Id.* at 1347. We observe that *Red Roof* is not applicable to the present case because liability here was sought under premises liability theory pursuant to Section 343 and not under a negligent hiring theory pursuant to Section 411.

trial." *Babson Bros. Co. v. Tipstar Corp.*, 446 N.E.2d 11, 15 (Ind.Ct.App.1983); *Dominguez v. Gallmeyer*, 402 N.E.2d 1295, 1300 (Ind.Ct.App.1980). We conclude that Swan Lake has waived this argument.

### III. Instruction Number Six

■ The Hileses also tendered instruction number six, which reads: "Indiana law does not allow a landowner to create a latent, non-obvious danger on its premises." Appellant's App. at 117–18. Swan Lake objected, arguing that the facts of this case were different from those of *Beta Steel v. Rust*, 830 N.E.2d 62, 71 (Ind.Ct. App.2005), the source of this language. Tr. at 406. The trial court gave the instruction over Swan Lake's objection.

■ Our standard of review is well settled:

> In reviewing a trial court's decision to give or refuse a tendered instruction, this Court considers whether the instruction (1) correctly states the law, (2) is supported by the evidence in the record, and (3) is covered in substance by other instructions. The trial court has discretion in instructing the jury, and we will reverse on the last two issues only when the instructions amount to an abuse of discretion.[6] The selection of instructions is left to the sound discretion of the trial court so long as the instructions as a whole accurately and completely set forth the elements of the parties' claims and defenses.

*Willis v. Westerfield*, 839 N.E.2d 1179, 1189 (Ind.2006) (citation omitted).

Swan Lake argues that *Beta Steel* is distinguishable from this case, and therefore the instruction lacks evidentiary support. In that case, the property owner, Beta Steel, was advised by its electrical engineer/consultant that an electrical control cabinet lacked ground fault protection as required by electrical safety regulations. The consultant informed Beta that without installing ground fault protection, human life was at risk. Beta told its consultant that it would install a ground fault protection system later, but it never did.

Approximately nine years later, Beta hired Hyre Electric to complete a project at its steel mill that involved work in the mill's electrical control room, where the aforementioned control cabinet was located. Brian Rust, a Hyre employee, was working in the room installing and welding a steel rack when he stepped onto the top of the cabinet. The cabinet top buckled and came into contact with energized components inside the cabinet, causing Brian's electrocution and death.

Brian's estate brought a wrongful death action against Beta Steel. Beta Steel appealed the denial of its motion for summary judgment, arguing, *inter alia*, that it owed no duty to Brian because it had ceded control of its electrical room to Brian's employer. The *Beta Steel* court found that a factual question existed as to whether Beta or Hyre controlled the property based on evidence that Beta had been fully responsible for the installation of the electrical control cabinet, the installation of the cabinet had been faulty, the nature of the job required persons to work in close proximity to the cabinet, Beta clearly had superior knowledge regarding the cabinet, and Beta was in a better position than Hyre to prevent the harm. *Beta Steel*, 830 N.E.2d at 71. The *Beta Steel* court then noted that the inherent dangerousness of the cabinet was much less obvious than the danger that caused the accident in *Rhodes*

---

6. When an instruction is challenged as an incorrect statement of the law, however, appellate review of the ruling is de novo. *Wal-*

*Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 893 (Ind.2002).

*v. Wright,* 805 N.E.2d 382 (Ind.2004).[7] The *Beta Steel* court stated, "It does not appear to us that Indiana law allows a landowner to create a latent, nonobvious danger on its premises[.]" 830 N.E.2d at 71.

Swan Lake asserts, "By pulling one sentence from a case with distinguishable facts, calling it a statement of law, and then successfully tendering such as an instruction, the jury is left with the impression that Swan Lake actually 'created' the alleged defect." Appellant's Br. at 41. The Hileses contend that the instruction was appropriate in the context of Swan Lake's argument that it could not be responsible for Dean's injuries when it was not in control of the Overhang when the injury happened. Appellees' Br. at 45. Although there are differences between this case and *Beta Steel,* the evidence here supports an inference that Swan Lake permitted a dangerous condition to develop on its property that it did not address, that is, the rotten purlins. In that sense, Swan Lake could be said to have "created" a dangerous condition. Our review of the record supports the Hileses' assertion that Swan Lake's lack of control was a significant issue in the case. Therefore, we cannot say that the trial court abused its discretion by giving instruction number six.

Affirmed.

BARNES, J., and BRADFORD, J., concur.

---

7. In *Rhodes,* a truck driver was killed in an accident with a forklift on a farm at night. Our supreme court held that summary judgment was inappropriate where there were factual issues as to whether the truck driver knew that the forklift's backup lights and alarm were not working, whether the farmers were negligent in failing to take precautionary measures, whether the danger was obvious, and whether the lack of outside lighting was the proximate cause of death. 805 N.E.2d at 388.