**Thomas PELAK and Diane Kaye Pelak, Appellants–Plaintiffs,**

v.

**INDIANA INDUSTRIAL SERVICES, INC., Pearson Education, Inc., and Prentice–Hall, Inc., Appellees–Defendants.**

No. 49A02–0402–CV–119.

Court of Appeals of Indiana.

July 25, 2005.

Rehearing Denied Sept. 29, 2005.

Ralph E. Dowling, Norris Choplin & Schroeder,LLP, Indianapolis, for Appellants.

Thomas C. Hays, Robert R. Foos, Jr., Lewis & Wagner, Indianapolis, for Pearson Education, Inc., and Prentice Hall, Inc.

## OPINION

MAY, Judge.

Thomas Pelak and Diane Kaye Pelak appeal the trial court's grant of summary judgment on their claim of negligence against Pearson Education, Inc. and Prentice–Hall, Inc. (collectively "Pearson") for injuries Thomas suffered.[1] The Pelaks

---

1. On January 23, 2001, Prentice–Hall, Inc. changed its name to Pearson Education, Inc.

raise several issues, which we consolidate and restate as whether a genuine issue of material fact existed as to Pearson's control of the premises where Pelak was injured.

We affirm.[2]

## FACTS AND PROCEDURAL HISTORY [3]

Pearson purchased a new conveyor and related equipment from Rapistan Systems.[4] Pearson issued a purchase order based on a bid proposal solicited from Rapistan. Rapistan sub-contracted with Indiana Industrial Systems ("IIS") to install the conveyor. The installation required the construction of a temporary catwalk system along an elevated section of the conveyor system. IIS built a catwalk consisting of sheets of bar grating placed on top of, but not affixed to, supporting structural steel. The catwalk had gaps where there was no grating, planking, warning signs, chains, rails or footboards.

On March 1, 2000, during the final stage of the conveyor's installation, Pelak, a senior project engineer for Rapistan, was on the catwalk at the center of the conveyor trouble-shooting the conveyor system's electronic controls. As he walked toward the front end of the conveyor, he fell through a two-to-three foot gap in the catwalk. He fell fifteen feet to a concrete floor and suffered severe injuries. On February 26, 2002, the Pelaks brought a premises liability action against Pearson and IIS.

Pearson filed a motion for summary judgment, which the trial court denied. Pearson then designated additional evidence and filed a second motion for summary judgment. The trial court granted the second motion for summary judgment, but it did not specify on what basis the motion was granted. Pelak requested permission to bring an interlocutory appeal, which we granted. Additional facts will be set forth as necessary.

## DISCUSSION AND DECISION

The Pelaks argue the trial court erred by entering summary judgment for Pearson because Pearson, as owner of the premises where Pelak was injured, owed Pelak a duty of care. Pearson argues it did not have a duty to provide a safe work environment for Pelak, who was an employee of an independent contractor, "because it did not control the allegedly dangerous condition, or the manner and means by which it was installed." (Appellee's Br. at 10.)

On appeal, the standard of review for a summary judgment motion is the same as that used in the trial court: summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Tom–Wat, Inc. v. Fink*, 741 N.E.2d 343, 346 (Ind.2001). All facts and reasonable inferences drawn from those

Prentice–Hall is the registered agent for Pearson.

2. We heard oral argument May 3, 2005. We commend counsel for the quality of their appellate advocacy.

3. This case was originally scheduled for oral argument on March 1. However, due to several inadequacies in Pelak's appendix, the oral argument was cancelled and we ordered counsel to file supplemental appendices with the Clerk of the Court. The supplemental appendices were filed with this court on March 28. Accordingly, the citations in this opinion refer to materials from the supplemental appendices.

4. Rapistan Systems in now known as Siemens Dematic.

facts are construed in favor of the non-moving party. *Shell Oil Co. v. Lovold Co.*, 705 N.E.2d 981, 984 (Ind.1998). Review of a summary judgment motion is limited to those materials designated to the trial court. T.R. 56(H); *Rosi v. Bus. Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). We must carefully review a grant of summary judgment to ensure a party was not improperly denied its day in court. *Estate of Shebel ex rel. Shebel v. Yaskawa Elec. Am., Inc.*, 713 N.E.2d 275, 277 (Ind.1999).

A negligence action is generally not appropriate for disposal by summary judgment. *Kincade v. MAC Corp.*, 773 N.E.2d 909, 911 (Ind.Ct.App.2002). However, a defendant may obtain summary judgment in a negligence action when the undisputed facts negate at least one element of the plaintiff's claim. *Id.* While proximate cause is generally a question of fact, it becomes a question of law where only a single conclusion can be drawn from the facts. *Id.* To avoid summary judgment, the Pelaks had to establish specific facts that support an inference Pearson was negligent. *Barsz v. Max Shapiro, Inc.*, 600 N.E.2d 151, 152–53 (Ind.Ct.App. 1992).

The tort of negligence consists of three elements: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) injury to the plaintiff proximately caused by that breach. *Kincade*, 773 N.E.2d at 911. Negligence "cannot be inferred from the mere fact of an accident." *Hale v. Community Hosp. of Indianapolis, Inc.*, 567 N.E.2d 842, 843 (Ind.Ct.App.1991). Rather, all the elements of negligence must be supported by specific facts designated to the trial court or reasonable inferences that might be drawn from those facts. *Kincade*, 773 N.E.2d at 911. An inference is not reasonable when it rests on no more than speculation or conjecture. *Id.*

## Duty of Landowners Generally

The duty a possessor of a premises owes to an employee of an independent contractor is well-settled. Generally, an owner of property is under no duty to provide an independent contractor with a safe place to work. *Zawacki v. U.S.X.*, 750 N.E.2d 410, 414 (Ind.Ct.App.2001), *trans. denied* 774 N.E.2d 508 (Ind.2002). However, the owner has a duty to maintain the property in a reasonably safe condition for business invitees, including employees of independent contractors. *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1264–65 (Ind.Ct.App.2002), *trans, denied* 783 N.E.2d 703; *Zawacki*, 750 N.E.2d at 414.

According to the Restatement (Second) of Torts § 343 (1965) on which Pelak relies, a possessor of land is subject to liability if the possessor: (1) knows or should know of a danger and should realize it involves an unreasonable risk; (2) should expect that invitees will not realize the danger or will not protect themselves against such; and (3) fails to exercise reasonable care to protect the invitees from danger. *Merrill*, 771 N.E.2d at 1265.

Similarly, control over a premises is used to determine who is liable for injuries on the premises. The thread through the law imposing liability based on occupancy of a premises is control. *Reed*, 781 N.E.2d at 1148. "[O]nly the party who controls the land can remedy the hazardous conditions which exist upon it and only the party who controls the land has the right to prevent others from coming onto it." *Id.* Thus, the party in control of the land has the exclusive ability to prevent injury from occurring. *Id.* The rationale is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent

any foreseeable harm. *Harris v. Traini,* 759 N.E.2d 215, 225 (Ind.Ct.App.2001), *trans. denied* 774 N.E.2d 516 (Ind.2002).

It is not apparent from the allegations of the complaint and the Pelaks' theory of the case that the Pelaks allege a duty arose based on the creation of a dangerous condition on the premises. Rather, their theory is that a duty arose based on the control Pearson retained as the premises owner. That theory is consistent with § 414 of the Restatement (Second) of Torts.[5] Therefore, we will address when a premises owner owes a duty of care to an employee of an independent contractor under § 414 of the Restatement. *See, e.g., Ross v. Dae Julie, Inc.,* 341 Ill.App.3d 1065, 275 Ill.Dec. 588, 793 N.E.2d 68 (2003); *see also Wajer v. Baltimore Gas and Electric Co.,* 157 Md.App. 228, 850 A.2d 394, 400 (2004) ("Appellants concentrated on the latent danger element of § 343 and on the amount of control appellees exerted over the three work sites in question, which is indicative of § 414.")

### Restatement Section 414

■ Section 414 provides:

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Section 414 applies where there is retention of control over the operative detail of the work. *Wajer,* 850 A.2d at 402. Comment c to § 414 discusses the limits of the rule:

In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the *manner in which the work is done.* It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Restatement (Second) of Torts § 414, cmt. c (1965) (emphasis supplied).

There is no persuasive public policy argument for imposing on a landowner a duty to guard a contractor's employees from an instrumentality exclusively controlled by the contractor. Generally, a contractor has the superior experience, equipment, knowledge, staff, and incentive to protect its employees. *Teitge v. Remy Const. Co., Inc.,* 526 N.E.2d 1008, 1012 (Ind.Ct.App.1988). "Chaos would reign supreme on any job where several [entities] with divergent concepts of safety might take seriously their supposed duty to supervise the safety practices of themselves and each other." *Id.*

Under § 414, if Pearson did not have sufficient control over the property to create a duty, then Pearson was entitled to summary judgment because the Pelaks' negligence claim would fail as a matter of law. *See U–Haul Int'l, Inc. v. Mike Ma-*

---

**5.** This court has previously relied on the § 414 analysis of control. *See Cummings v. Hoosier Marine Properties, Inc.,* 173 Ind.App. 372, 363 N.E.2d 1266 (1977). Neither the Pelaks nor Pearson explicitly mention this section of the Restatement or explicitly discuss its application to the case before us.

*drid Co.,* 734 N.E.2d 1048, 1052 (Ind.Ct. App.2000).

The Pelaks maintain that as owner of the premises, Pearson controlled it. Specifically, they argue, "[s]ummary judgment can be granted on this issue only if 'there is **no evidence** that the landowner maintained **any control** over the 'manner or means' by which the contractor engaged in its work." (Appellants' Br. at 29–30) (emphasis in original).

Pearson responds it "did not have any control over the manner in which the equipment, including the temporary bar grating, was installed, with the exception of providing work space and/or scheduling." (Appellee's Br. at 7.) Pearson asserts it did not retain the requisite control to subject it to liability as premises owner. Pearson cites our decisions in *Bethlehem Steel Corp. v. Lohman,* 661 N.E.2d 554 (Ind.Ct.App.1995), and *Phillips v. United Engineers & Constructors, Inc.,* 500 N.E.2d 1265 (Ind.Ct.App.1986), for the premise that "[a] property owner who does not control the manner or means by which a contractor performs his work, does not therefore reserve control of job site safety so as to render the property owner liable for the contractor's injuries." (Appellee's Br. at 17.)

In *Bethlehem Steel,* Bethlehem appealed the denial of its motion for summary judgment in an action brought by Lohman for injuries he sustained while engaged in maintenance work on a crane located on Bethlehem's property:

> In June of 1991, Lohman was an employee of Hunter Corporation (Hunter). Pursuant to a contract with Bethlehem, Hunter was required to "furnish all necessary supervision, labor, material, equipment and insurance to provide and

operate 150 Ton Crawler Cranes" and was also obligated to "furnish all necessary supervision, labor, material, insurance and equipment to perform general maintenance type work" on these cranes. North Central Crane owned the crane at issue, crane no. 17.

> On June 13, 1991, Lohman was engaged in maintenance work on crane no. 17, applying a cleaning solvent to the engine of the crane with a sprayer wand. During the cleaning process the wand brushed against an air release or control valve, generating sparks which started a fire. Lohman received burns to his lower extremities as a result of the fire.

*Bethlehem Steel,* 661 N.E.2d at 555 (internal citations omitted). We held that where an instrumentality causing injury is in the control of an independent contractor, the contractor's employee seeking to hold the property owner liable for injury must show either the owner assumed control of the instrumentality or had superior knowledge [6] of potential dangers involved in its operation. Otherwise, the owner owes no duty to the employee. *Id.* at 556.

In *Phillips,* a contractor's employee died when he fell from an elevated catwalk where he had been installing sheet metal siding. Hoosier Energy, the owner of the property where the decedent fell, moved for summary judgment on the ground it owed no duty to the decedent. Phillips, the administrator of the decedent's estate, argued Hoosier Energy retained such a degree of control over the activities of the contractors on the project that it owed a duty to the decedent.

Phillips maintained various contractual provisions demonstrated Hoosier Energy reserved the right to control or govern the

---

6. More recently, our supreme court held "[w]hether a landowner has superior knowledge goes to the question of breach, not of duty, and it is one factor among many used to determine if there was a breach." *Rhodes v. Wright,* 805 N.E.2d 382, 388 (Ind.2004).

contractors. On examination of the contracts, we held:

> [I]t is apparent that Hoosier Energy required nothing more than that materials furnished and work performed meet the plans and specifications, and that contractors conform to federal, state and local safety regulations. If control is said to be operative when the right of some supervision is retained, it must be more than a general right which is usually reserved to those who hire persons to perform work.

\* \* \* \* \*

Phillips also presents no evidence that Decedent himself was under the control or direction of Hoosier Energy in performing his assigned duties. Absent any control by Hoosier Energy over the manner or means by which the independent contractors or Decedent performed their duties, we must conclude that Hoosier Energy could not have owed Decedent any duty predicated upon a right to control found in the contract.

*Phillips*, 500 N.E.2d at 1267.

More recently, in *Zawacki*, 750 N.E.2d at 410, and *Merrill*, 771 N.E.2d at 1258, we addressed whether landowners retained the requisite control to preclude summary judgment on the negligence claims against them. In *Merrill*, an independent contractor was hired to make repairs to the roof of a warehouse owned by Knauf. The warehouse was equipped with fiberglass skylights that were not covered with any type of fall protection, such as wire mesh. Knauf warned the independent contractor to be cautious around the skylights and noted that an employee had previously fallen through one. The independent contractor's employees were warned of the dangers of the skylights. Nonetheless, Merrill, an employee of the independent contractor, fell through a skylight when a co-worker distracted him as he walked across the roof.

We upheld summary judgment for Knauf. Knauf was aware of the danger with the skylights, and to the extent it believed the independent contractor's employees would not recognize that danger, it warned them of the risks involved. *Merrill*, 771 N.E.2d at 1265. Consequently, we determined Knauf could be liable for Merrill's injuries if Knauf should have anticipated Merrill would fail to protect himself from the harm despite his knowledge, but nevertheless failed to exercise reasonable care to protect Merrill. *Id.* We noted the independent contractor was in control of the manner in which the roof was to be repaired and the resources used in the project, including the activities of its employees. *Id.* Knauf could not have anticipated the circumstances that caused Merrill to fall through the skylight. *Id.* at 1266. Therefore, we determined Knauf could not be liable for Merrill's injuries.

In *Zawacki*, an employee of an independent contractor was injured when a plate of steel with which he was working fell on his foot. The employee had cut a three-foot section of a heat shield loose from a girder on U.S.X. property. The employee thought the plate was held in place by bolts, but in reality, the bolts were "dummy bolts," *Zawacki*, 750 N.E.2d at 412; the head of a bolt was welded to the plate but no bolt went through the girder. We noted the site was under the control of the independent contractor at the time of the accident. The agreement between U.S.X. and the independent contractor stated the independent contractor was responsible for the work site and safety of its employees. No inspection of the steel plate before it was removed could have revealed the bolts did not actually hold the steel plate in place.

In determining the trial court correctly granted summary judgment in favor of U.S.X., we relied on the fact that U.S.X. did not have superior knowledge[7] of the existence of the dummy bolts and did not know that the employee would rely on the dummy bolts to hold the steel plate in place as he cut the shield loose. *Id.* at 415–16. We noted the independent contractor was in control of both the site and its employees and U.S.X. did not specify the means and methods by which the employees of the independent contractor would perform their jobs. *Id.* at 415.

Our supreme court recently addressed a landowner's retention of control in *Rhodes v. Wright,* 805 N.E.2d 382 (Ind.2004). The Wrights raised chickens under a contract with Tyson Foods. Rhodes was a truck driver for Tyson. Rhodes' estate brought a negligence action against the owners of the Wright farm after he was struck and killed by a forklift while chickens were being loaded at the farm. The accident occurred at night, the lights inside the chicken house were off, and there were no external lights to illuminate the area. The back-up lights and back-up alarm on the forklift were not working.

Rhodes' estate claimed the Wrights were negligent in failing to light the loading area properly and failing to warn the decedent of known dangers on the property. The trial court granted summary judgment for the farm owners and we affirmed "in part because [we] found that they did not owe a duty to [the decedent] because they did not exert control over the area where the accident occurred when it occurred." *Id.* at 385. We based our conclusion on the contract between Tyson and the Wrights. *Id.*

On transfer, our supreme court noted that in premises liability cases, whether a duty is owed depends primarily on whether the defendant was in control of the premises when the accident occurred. *Id.* The purpose of the law is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm. *Id.* Whether a duty exists is generally a question of law for the courts to decide, but the existence of a duty sometimes depends on underlying facts that require resolution by the trier of fact. *Id.* at 386.

Our supreme court determined a sufficient factual dispute existed as to whether Tyson or the Wrights controlled the premises where and when the accident occurred that a jury should decide the issue. *Id.* The court noted that even were Tyson in control of the premises at the time of the accident, the owners of the farm would not automatically be relieved of responsibility for injuries to Tyson's employees. *Id.* In reaching that conclusion, the court relied on the fact that Tyson provided specifications for construction of the buildings but did not prescribe any procedure for external lighting. *Id.*[8]

---

7. As previously mentioned, *infra* n. 5, superior knowledge goes to the question of breach, not of duty.

8. The Pelaks cite to *Guy's Concrete, Inc. v. Crawford,* 793 N.E.2d 288 (Ind.Ct.App.2003), and *Messer v. Cerestar USA, Inc.,* 803 N.E.2d 1240 (Ind.Ct.App.2004), in support of their assertion that "Indiana has recognized the sharing of control between premises owners and others who exert sufficient control over premises to justify imposing a duty to invitees and allow juries to allocate fault among the parties exerting such partial degrees of control." (Appellants' Br. at 8–9.)

The Pelaks contend these cases are indicative of a trend in Indiana caselaw involving injuries related to alleged negligence by both premises owners and subcontractors on the premises which "have ceased to be treated as binary matters—that is, by deciding which party has control, to the exclusion of all others." (*Id.* at 9.) The Pelaks assert "all parties

The Pelaks argue the following designated evidence "shows Pearson at least shared control of the premises and/or catwalk with IIS and that, at the time of the fall, had resumed full control." (Appellants' Br. at 30.)

1. Rapistan's bid proposal, which led to the sale and installation of the conveyor system, required Pearson to provide, "[a]ll area guarding necessary to protect personnel and conveyor equipment—i.e. warning signs, hand rails, barriers, netting, floor markings, etc," to permit Rapistan to perform its work at the site. The proposal also required Pearson to provide other "Site Conditions" it could not provide without some control over the premises.

2. Pearson's supervisor prepared an accident/incident investigation report, after [Pelak's] fall, in which he noted that Pearson needed "to check and see if

contractors are required to wear safety belts when . . . [the contractor is] more than 15 feet in the air." Pearson's decision to investigate the fall and determine whether safety procedures should have been followed suggests Pearson believed [9] it had the responsibility to prevent injuries on its premises.

3. Pearson's engineering manager's testimony that, if he had witnessed blatant violations of OSHA regulations on the premises by the subcontractors, he or another Pearson employee would require correction of the violation.

4. IIS was not in charge of securing the premises and could not prevent business visitors from entering and using the premises.[10]

5. Pearson controlled access and egress to the premises.

6. Pearson could have forbidden invitees to use the catwalk in its condition.[11]

with sufficient control to justify the imposition of a duty may be liable to the injured plaintiff to the extent of their comparative fault in causing the injury." (*Id.*)

We acknowledge that under certain circumstances, control may be "shared" by premises owners and others. *See, e.g., Rhodes,* 805 N.E.2d at 386–87. However, the designated evidence in the case before us does not demonstrate Pearson had sufficient control over the IIS workplace to subject it to potential liability.

The Pelaks also cited *PSI Energy, Inc. v. Roberts,* 802 N.E.2d 468 (Ind.Ct.App.2004), *trans. granted* 812 N.E.2d 806 (Ind.2004). That decision was vacated before the Pelaks submitted their brief to this court; we accordingly do not address the Pelaks' arguments regarding our *PSI* decision. Our supreme court has since decided *PSI. See PSI Energy, Inc. v. Roberts,* 829 N.E.2d 943 (Ind. 2005). The supreme court did not engage in the "control" analysis we find determinative in the case before us. We therefore need not address its *PSI* decision.

Additionally, on July 7, 2005, the Pelaks filed with this court what we will treat as a motion for leave to submit additional authority. The Pelaks offer *Beta Steel v. Rust,* 830

N.E.2d 62 (Ind. Ct.App. 2005). In *Beta Steel,* one issue before the panel was whether Beta owed a duty of care to an employee of an independent contractor Beta hired to perform work at Beta's facility. We determined Beta's motion for summary judgment was properly denied because Beta had "complete control over the design and installation" of an electrical control cabinet that allegedly caused the victim's death. Slip op. at 12. In the case before us the Pelaks have designated no such facts demonstrative of control.

9. The Pelaks do not explain how Pearson's subjective belief is relevant to the legal standard it asserts is applicable.

10. The pages of the appendix to which the Pelaks direct us contain no such statement.

11. The portions of the record the Pelaks cite do not support this assertion. They cited the deposition testimony of Paul Zale and Bruce Cunningham. The cited portions of Zale's testimony state:

Q So if IIS wants to come in and just ignore every OSHA regulation known to mankind within your building, you don't

7. After [Pelak's] fall, Pearson made all of the conveyor system catwalks at its facility permanent and installed all necessary guarding.

8. Any control IIS had at a prior time over Pearson's premises or of the catwalk from which [Pelak] fell ended with IIS's completion of its work there. According to IIS's project manager ... IIS's projects go through three phases: (1) construction/installation, (2) commissioning, and (3) final runoff (customer has accepted product). IIS had completed its construction/installation before [Pelak] fell. [Pelak] was troubleshooting the commissioning.

(Appellants' Br. at 28–29) (internal citations omitted) (footnotes added).

The Pelaks' arguments rest in part on their theory that the Rapistan bid proposal leading to the sale and installation of the conveyor system demonstrates Pearson's control. The Pelaks' argument in its entirety is:

The proposal/contract between Pearson and Rapistan discussed "safe practices in the design, construction, installation, operation, and maintenance of the equipment," and provided that "Pearson ... will provide man lifts, platforms, or similar devices for the safe maintenance servicing of elevated equipment where cat-

walks, platforms, or similar means of access are not provided." Pearson was to provide "[a]ll area guarding necessary to protect personnel and conveyor equipment-*i.e.* warning signs, hand rails, barriers, netting, floor markings, etc," for Rapistan to perform its work at the site. This obliged Pearson, during installation, to maintain control of the catwalk, the safety of the catwalk, and the safety of the work being done. Thus, Pearson never lost the control giving rise to its duty to Tom.

(Appellants' Br. at 20) (internal citations omitted.)

The Pelaks do not offer explanation or legal authority to support its apparent premise that these facts demonstrate sufficient control over the manner in which Rapistan did its work to avoid summary judgment. Nor does it offer explanation or authority as to which, if any, of this designated evidence shows Pearson retained the requisite control of work or safety issues so as to owe a duty of care to Pelak.

Pearson asserts the Pelaks "continuously and erroneously treat the bid proposal as if it were a binding contract between Rapistan and Pearson" (Appellee's Br. at 41) and "the citation to the bid proposal

think there is anybody at Pearson who would have the responsibility of asking them to quit doing that?

A  Phrasing it that way, yes, I do think that if they were disobeying obvious and blatant OSHA rules, I would—myself, or somebody else, would ask them not to.

Q  All right. If you noticed a safety issue that you were concerned with, whether or not it was an OSHA violation, it just like looked like there was something unsafe going on at this work site, would you feel that you should address that with the subcontractor, or with Rapistan so it indirectly gets to the subcontractor?

A  Sure.

(Appellants' Supp.App. at 88.)

The cited portions of Cunningham's deposition state:

Q  Okay. If Pearson had come up to you during this job and said, We are concerned about this bar grating being incomplete and not permanently affixed and we are going to have somebody come in here and install permanent grating along the entire length of that conveyor to make it safe, would you have stopped them?

A  They are my boss [sic].

Q  Would that have interfered with your work?

A  No.

(*Id.* at 114.)

has nothing to do with Pearson being on notice of an allegedly defective temporary bar grating system." (*Id.*) Pearson further maintains:

Even if the provision were applicable, which it is not, there is no indication that this provision [put] Pearson on notice that: (1) a temporary bar grating system [would] be installed; (2) that the temporary bar grating [would] have a 2–3 foot gap in it; and (3) that [Pelak would] incur the risks associated with the gap despite his knowledge of it.

(*Id.*)

■■■ The bid proposal was a binding contract. In Indiana, a written proposal for work to be done, a written bid of a party to do the proposed work, and a written acceptance of the bid amount to a contract to do the proposed work, even though a formal contract to do the work has not been executed. *Jackson v. Union–North United Sch. Corp.*, 582 N.E.2d 854, 857 (Ind.Ct.App.1991) (addressing a public works bid proposal), *trans. denied.* Pearson entered into a binding contract with Rapistan when it accepted Rapistan's bid to construct the conveyor system.

In *Rhodes*, 805 N.E.2d at 385, our supreme court stated:

The Court of Appeals placed too much emphasis on the contract between Tyson and Defendants in determining that no duty existed. The contract aids in understanding the business relationship between Tyson and Defendants, but that is all.

\* \* \* \* \*

In premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred. The rationale is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm.

Therefore, the bid proposal does not, without more, demonstrate control by Pearson of work or safety issues so as to give rise to a duty of care toward Pelak. Summary judgment was not erroneous on that ground.

Testimony regarding the nature of the bid proposal sheds additional light on the issue of control. Peter Malloy, senior project engineer for Rapistan, testified:

Q What were you supposed to be doing at the Pearson Education building?

A We were installing a conveyor system for Pearson Education.

\* \* \* \* \*

Q Did you—when I say you, I mean Rapistan, did Rapistan subcontract any part of the job to any other entity?

A Only insofar as using Indiana Industrial as the installer . . .

\* \* \* \* \*

Q Okay. When you say Indiana Industrial was the installer, explain to me what the installer is.

A . . . Indiana Industrial would be the mechanical installers of that equipment for this particular project.

\* \* \* \* \*

Q Was there a catwalk erected to permit access to the conveyor system at that job site?

\* \* \* \* \*

A . . . the area in which Mr. Pelak had his accident was an area in which Indiana Industrial had put some temporary planking for their own use only and it was not a permanent fixture or

catwalk which was to remain there. It was something they utilized to help them better install the conveyor. In other parts of the building there were catwalk/mezzanine areas which were designed purposely to be used by personnel.

* * * * *

Q   Who ordered this planking put up[?]

A   To [sic] a discussion with Bruce Cunningham based on the nature of the installation, he had asked if he could put some planking up for his use in then [sic], which I agreed with him that if he felt is was something that would aid him in this installation, to go ahead and do it.

* * * * *

Q   Who oversaw the erection of the planking or the laying of the planking[?]

A   Indiana Industrial, but specifically I do not know.

* * * * *

Q   And who initiates the purchase of material?

A   That would be the project manager. In this case that would be myself.

Q   And where would you purchase the actual conveyor materials from?

A   The conveyor materials are purchased from our own company, Rapistan[.]

Q   Does Rapistan or did Rapistan also produce bar grading [sic] such as was used in this temporary planking system?

A   No. That would be something that—what we would call a buyout item in which we purchase that from a supplier.

Q   Okay. Is it your understanding that your bid proposal to Rapistan for this particular job did not include the erection of a catwalk at or near the place were Mr. Pelak fell?

A   That is correct.

Q   So is it also my understanding that at least looking only at your bid proposal, that there would be no way for Pearson Education to know that there was going to be a temporary planking system erected there?

A   That is correct. . . . And to our knowledge, I don't believe they would have input to that because it's something that is utilized just in the installation of the project and would normally be taken down upon completion.

Q   Okay. Let me talk with you about how the actual implementation of the machinery in the conveyor system occurs on site. Does Pearson Education have any control over the manner in which the equipment is installed?

A   Only insofar as allowing us work space and/or scheduling as to what gets installed at what particular point during the course of a project.

Q   Okay. And when you say allowing you work space, what do you mean by that?

A   This is an ongoing facility that's in operation. And they would tell us points of the day in which it was acceptable for us to work and locations in which we could work whereby their personnel wasn't in the way of what we were trying to install or put in a point of danger whereby we are correcting equipment over the top of perhaps somebody working down below.

* * * * *

Q   Did Pearson Education exercise any control over the new conveyor system

before it was fully commissioned and accepted?

A  No, they did not.

Q  During this conversation that you had with Bruce Cunningham about this planking system, was Pearson Education ever consulted about the use of this temporary planking?

A  No, they were not.

Q  To the best of your knowledge, under either your bid proposal or a purchase order, does Pearson Education owe any duty to inspect your work or the work of Indiana Industrial?

A  No, they have no responsibility.

* * * * *

Q  Did you sometimes see [Paul Zale] in the area at all?

A  Yes, I would.

Q  Did he ever give you any instructions as to how he wanted things done differently than you were doing them?

A No, he did not.

(Appellants' Supp.App. at 302–03, 305–06, 311–12, 319.)

Pearson denies having control of the work area, including the temporary bar grating, when the work was being performed.  In his deposition testimony, Pearson industrial engineer Paul Zale testified in relevant part:

Q  Okay.  Was there somebody in charge of safety within the Pearson facility at the time of the incident?

A  Yes, we have a safety person at all of our facilities.

Q  Who would that person have been?

A  Sherry Reece.

12.  Occupational Safety and Health Act.

* * * * *

Q  And what were her job responsibilities, as you understand them?

A  She is HR manager and safety manager.

Q  And what does the safety manager do at Pearson?

A  Making sure that Pearson complies with OSHA [12] regulations[.]

* * * * *

Q  Okay.  To your knowledge, who was the person at Pearson most closely involved with the actual installation of this conveyor system?

A  Myself.

Q  Okay.  How often were you checking on this installation?

A  Daily.

Q  And did you talk to Pete Malloy?

A  Yes.

Q  And did you also talk to people from IIS?

A  On rare occasions.  If there was— they left stuff on the floor that needed to be cleaned up or if they had put product where we actually needed to be working, if I were passing them and they were closer than Pete, would I tell them, you know, you need to move this. But that would be my [sic] extent.  If there was something that was more critical or pertained to the job, other than, you know loose ends here and there, I would talk to Pete directly.

* * * * *

Q  . . . Did you have any discussions . . . with anyone at Rapistan or at IIS about these elevated walkways or catwalks or gratings, as we have been discussing?

A  Permanent gratings and permanent mezzanine structures, yes. Temporary, no.

Q  Okay. So you never discussed with IIS its use of these movable non-affixed gratings?

* * * * *

Q  Okay. Now, when you were over there on this project, did you ever see your safety person over there supervising, observing, checking on the safety issues in that area?

A  No.

Q  Have you ever discussed this with her to see if she had done any of that?

A  No.

Q  Was there somebody that you understood, at IIS, who was in charge of safety?

A  I would assume it would be the site supervisor.

(*Id.* at 82, 83, 87) (footnote added).

In his deposition, Pelak testified in relevant part:

Q  Okay. How many times that day would you say you had crossed that 2—[sic] to 3 foot gap before the fall?

A  Maybe three.

Q  Were Pete Guzier [13] and Pete—Guzier, is that—

A  Guzier.

Q  —Guzier and Pete Malloy also up on the catwalk with you at any time?

A  Yes they were.

Q  Did they spend the bulk of the day up there as well?

A  No. No. They familiarized me with the unit and then I was pretty much left on my own to—to work.

(*Id.* at 130.)

Finally, Bruce Cunningham, IIS's project manager, testified in relevant part:

Q  Did any employees of Pearson help in the installation of the structure?

A  No.

Q  Did any employees of Pearson help in the installation of the conveyors?

A  No.

Q  Did any employees of Pearson, that you are aware of, ever handle any of the temporary bar grating?

A  During the project, no.

* * * * *

Q  Okay. During the installation process of both the structure and the conveyor, did you ever take any orders or report to any employee of Pearson?

A  No.

Q  You would have been reporting to Pete Malloy of Rapistan; is that right?

A  Yes.

(*Id.* at 113.)

In *Foster v. National Starch & Chemical Co.*, 500 F.2d 81 (7th Cir.1974), an employee of a contractor brought a personal injury action against National Starch, the premises owner. The Seventh Circuit applied Restatement § 414 and held:

[M]ere retention by National Starch of a general right 'to order the work stopped or resumed, to inspect its progress or receive reports, to make suggestions or recommendations which need not be followed, or to prescribe alterations and

13.  Guzier is an employee of Rapistan.

deviations' cannot render National Starch liable.... Under the rule, National Starch is not subject to liability unless it retained control to the degree that it interfered with the freedom of [the independent contractor] to do the work in its own way.

*Id.* at 83 (internal citations omitted).

In *Cummings v. Hoosier Marine Properties, Inc.,* 173 Ind.App. 372, 363 N.E.2d 1266 (1977), a worker was fatally crushed when part of a wall adjoining a sewer trench caved in, covering the worker. No sheeting or shoring supported the walls of the excavation. In affirming judgment on the evidence for the owner of the project, we observed:

If control is said to be operative when the right of some supervision is retained, it must be more than a general right which is usually reserved to all those who employ the labors of another. *See,* 2 Restatement of Torts 2d, s 414, at 387, Comments (1965). The control must be such as would enable the landowner to oversee the method of work employed. It must be a control which would under the common-law have given rise to the doctrine of respondeat superior.

\* \* \* \* \*

Thus if an owner gives directions for the work, furnishes equipment for it, or retains control over any part of it, he is required to exercise reasonable care for the protection of others. But the right to control one's subcontractor must have sufficient practical effect that an imposition of vicarious liability will encourage a form of supervision which will promote accident prevention. Absent the prophylactic purposes supporting liability under respondeat superior, the attachment of liability under the rubric of control becomes solely remedial and compensatory; a result in this case

which would be confined to workmen's compensation.

363 N.E.2d at 1272.

"The word 'control' has no legal or technical meaning distinct from that given in its popular acceptation ... and refers to the power or authority to manage, superintend, direct or oversee." *Mozeleski v. Thomas,* 76 Conn.App. 287, 818 A.2d 893, 899 (2003). In *Mozeleski,* an independent contractor brought a negligence action against the property owner and scaffolding owner after an accident where the independent contractor was performing masonry work on the property owner's premises. The independent contractor fell approximately 30 feet from the scaffolding. The premises owner and scaffolding owner filed motions for summary judgment, which the trial court granted. The Connecticut appellate court, applying § 414 of the Restatement (Second), held:

Although the plaintiff claims that [the premises owner] retained control over the construction site, the mere fact that [the premises owner] observed the progress of the work is not sufficient to establish control. The owner may exercise a limited degree of control or give the contractor instructions on minor details without destroying the independent character of the contractor. Moreover, it is undisputed that the plaintiff fell off the scaffolding and was injured because he himself constructed it incorrectly.

*Id.* at 898 (internal citations omitted).

Accordingly, the Pelaks have failed to demonstrate an issue of fact relating to Pearson's control over the work site and its duty as a landowner. The designated evidence established Pearson's representatives were not aware the temporary catwalk was being erected, nor did they have any say over the manner or means by which it was erected. IIS oversaw the

erection of the planking for the temporary bar grating system and determined it was necessary to use such planking to better facilitate the installation of the conveyor system.

Pearson did not help with the installation of the conveyor nor did anyone from Pearson handle any of the temporary bar grating. During the installation of the temporary bar grating and the conveyor IIS reported directly to Malloy, a Rapistan employee and at no time did IIS take orders from or report to Pearson. Indiana cases have uniformly held that where an instrumentality causing injury was in the control of an independent contractor, a duty will not be found where there is no evidence that the landowner maintained any control over the "manner or means" by which the contractor engaged in its work. *See, e.g., Bethlehem Steel Corp.*, 661 N.E.2d at 556.

## CONCLUSION

Absent a duty, there can be no recovery for the plaintiff in a negligence cause of action. *Vaughn v. Daniels Co. (West Virginia), Inc.*, 777 N.E.2d 1110, 1133 (Ind.Ct.App.2002). Therefore, we affirm the trial court's grant of Pearson's motion for summary judgment.

The Pelaks did not designate evidence that would give rise to an issue of fact as to whether Pearson, as premises owner, owed a duty to Pelak. We affirm the trial court's grant of summary judgment for Pearson.

Affirmed.

SHARPNACK, J., and BAILEY, J., concur.