Christine R. SCHEIBLE, as the mother of Travis David Scheible, deceased, Appellant–Plaintiff,

v.

Fred JACKSON, Ronald Smith, and Ray M. Scheible, Appellees–Defendants.

No. 03A01–0704–CV–186.

Court of Appeals of Indiana.

March 7, 2008.

David W. Craig, Scott A. Faultless, Craig Kelley & Faultless, Indianapolis, IN, Attorneys for Appellant.

R. Jeffrey Lowe, J. Todd Spurgeon, Kightlinger & Gray, LLP, New Albany, Eric D. Johnson, Kightlinger & Gray, LLP, Indianapolis, IN, Attorneys for Appellee Fred Jackson.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Plaintiff Christine R. Scheible ("Scheible") appeals the trial court's grant of Appellee–Defendant Fred Jackson's ("Jackson") Motion for Summary Judgment.[1] We reverse and remand.

1. The trial court's Entry of Partial Judgment addressed only Scheible's claim against Fred

## Issue

Scheible raises the sole issue of whether the trial court erred in granting Jackson's Motion for Summary Judgment.

## Facts and Procedural History

The facts recited throughout this opinion are those alleged by and most favorable to Scheible, the non-movant. Jackson and his wife Dorothy Jackson ("Dorothy") owned two parcels on the north side of 7th Street in Columbus, Indiana—1422 and 1426 7th Street ("Property"). On December 31, 2004, the Jacksons and Ronald Smith ("Smith") entered into an "Installment Contract Sale of Real Estate" ("Contract"). Appendix at 84. The Jacksons retained legal title to the Property, while Smith immediately took possession. The Contract required Smith to carry insurance, naming the Jacksons and Smith as insureds. Despite that Contract term, Jackson maintained and continued to pay two insurance companies for existing policies on the Property—one policy on 1422 7th Street and one on 1426 7th Street. Smith would then reimburse him for the insurance.

Either at the end of 2004 or in early 2005, Jackson received a certified notice from the City of Columbus regarding saplings growing on the Property. Jackson gave the notice to Smith, who "agreed to remedy it" and did so. *Id.* at 134.

A mature tree on the Property hung over the sidewalk, the grass strip between the sidewalk and the road, and part of 7th Street's westbound lane. Branches of the tree drooped quite low, touching or almost touching the grass between the sidewalk

and the street. On July 5, 2005 at approximately 4:33p.m., Scheible's ten-year-old son, Travis Scheible ("Travis"), was riding his bicycle eastbound on the sidewalk along the north side of 7th Street. At the same time, Barbara Lee ("Lee") was driving westbound on the same street. Just west of the tree, Travis started to cross the street. The leaves and branches of the tree obstructed his view. Lee struck Travis' bicycle. He died the next day.

Scheible sued Jackson, Smith, and Travis' father.[2] She alleged that Jackson and Smith both exercised control of the Property and that they owed a duty "to the traveling public" to maintain the Property in a reasonably safe condition. *Id.* at 44. Jackson moved for summary judgment, arguing that he owed no duty of care to Travis. The trial court issued its Entry of Partial Judgment, granting Jackson's motion.[3]

Scheible now appeals.

## Discussion and Decision

### I. Standard of Review

The trial court must grant a motion for summary judgment "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). We apply the same standard as the trial court. *See s v. Bank One, Indiana,* 839 N.E.2d 154, 160 (Ind.2005). "The court accepts as true those facts alleged by the nonmoving party, construes the evidence in favor of the nonmoving

---

Jackson. Nonetheless, the other defendants are parties to the appeal. A party of record in the trial court is a party on appeal. Ind. Appellate Rule 17(A).

**2.** While Jackson and Dorothy owned the Property, Scheible did not sue Dorothy.

Moreover, the record is unclear as to the status of Scheible's claim against Lee.

**3.** The Entry of Partial Judgment is conclusory and therefore does not provide us the full benefit of the trial court's analysis.

party, and resolves all doubts against the moving party." *Id.*

## II. Analysis

█ Jackson argues that he owed no duty to Travis as Jackson had sold the Property, exercised no control of the Property at the time of the accident, and therefore stood essentially as no more than a mortgagee of the Property. This case presents an issue of first impression; namely, under what conditions can the vendor in a land-sale contract detach himself from liability for the condition of the land.

As an initial matter, we note that Travis was not on the Property when he was struck and that the accident resulted allegedly from a natural condition of the Property. In *Valinet v. Eskew*, our Supreme Court adopted Restatement (Second) of Torts Section 363, which provides:

§ 363. Natural Conditions

(1) Except as stated in Subsection (2), neither a possessor of land, nor a vendor, lessor, or other transferor, is liable for physical harm caused to others outside of the land by a natural condition of the land.

(2) A *possessor* of land in an *urban area* is subject to liability to *persons using a public highway* for physical harm resulting from his failure to exercise reasonable care to prevent an unreasonable risk of harm arising from the *condition of trees on the land near the highway.*

*Valinet v. Eskew*, 574 N.E.2d 283, 285 (Ind.1991) (adopting and quoting Restatement (Second) of Torts (1965) § 363 (emphases added)). The *Valinet* Court noted that "[t]he rationale for imposing such a duty on urban landowners is that the risk of harm to highway users is greater and the burden of inspection on landowners is lighter in such populated areas." *Valinet*, 574 N.E.2d at 285. While the Restatement used the term "possessor" in Subsection (2), the *Valinet* Court used that term only once, in a section of the Opinion addressing a different issue. *Valinet*, 574 N.E.2d at 287. In the portion analyzing Restatement Section 363, the *Valinet* Court repeatedly and exclusively used the term "landowner." *Id.* at 285–86. From this, we conclude that the *Valinet* Court was analyzing only the duty of urban landowners to people using adjacent streets, without distinguishing between types of landowners, such as possessors, vendors, and lessors.

As to the duty of vendors, multiple jurisdictions have held and the Restatement (Second) of Torts has recognized that the vendor in a land-sale contract avoids liability on the subject real estate by relinquishing possession and control to the vendee, at least where the vendee has had a reasonable opportunity to address a known defect.[4]

---

4. While six months may be adequate time to notice and remove a tree obstructing a right-of-way, we cannot so conclude as a matter of law, as this presents a question of fact. In adopting Restatement (Second) of Torts (1965) § 363, our Supreme Court emphasized that the requisite care and frequency of inspection are questions of fact.

> [W]hether the landowner exercised the requisite reasonable care will require the fact finder to weigh the seriousness of the danger against the ease with which it may be prevented. As this Court has previously held, a landowner need not continually inspect his property for natural dangers. However, under some circumstances, fulfilling a landowner's duty to passing motorists might reasonably require periodic inspections to be sure that the premises do not endanger those lawfully on the highway.

*Valinet v. Eskew*, 574 N.E.2d 283, 285–86 (Ind.1991) (citing *Blake v. Dunn Farms, Inc.*, 274 Ind. 560, 413 N.E.2d 560, 564 (1980)).

Similarly, in *Farragher v. City of New York*, the Court held that the vendor, not the vend-

**§ 352. Dangerous Conditions Existing at Time Vendor Transfers Possession**

Except as stated in Section 353 [Undisclosed Dangerous Conditions Known to Vendor], a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.

Restatement (Second) of Torts § 352 (1965). *See Lake v. United States*, 522 F.Supp. 166 (N.D.Ill.1981); *Anderson v. Cosmop. Nat. Bank of Chicago*, 54 Ill.2d 504, 301 N.E.2d 296 (Ill.1973); *Conneely v. Herzog*, 33 A.D.3d 1065, 822 N.Y.S.2d 662 (N.Y.App.Div.2006); *Welz v. Wong*, 413 Pa.Super. 299, 605 A.2d 368 (Pa.1992); *Dubray v. Howshar*, 884 P.2d 23 (Wyo. 1994).

█ The general rule of the vendor's non-liability stated in Section 352 of the Restatement (Second) of Torts applies where possession and control have actually passed from the vendor to the vendee. Where a person retains control, however, liability may still attach. In *Marsden v. Eastern Gas and Fuel Associates*, the vendor divested itself of title, but effectively maintained control of the property. The *Marsden* Court upheld the plaintiff's verdict, reasoning as follows:

It is apparent that prior to [the accident], the defendant had divested itself of bare legal title to the way. However, it is control rather than legal ownership with which we are concerned. One who assumes the control and management of property cannot escape liability for injuries by showing a want of title in himself.

*Marsden v. Eastern Gas & Fuel Assoc.*, 7 Mass.App.Ct. 27, 385 N.E.2d 528, 530 (1979) (citations omitted). Indeed, Jackson acknowledges on appeal that "tort liability is imposed on those who have the ability to control—and therefore remedy—any defect in the premises." Appellee's Brief at 10 (citing *Pelak v. Ind. Indus. Serv., Inc.*, 831 N.E.2d 765, 769 (Ind.Ct. App.2005) ("The thread through the law imposing liability based on occupancy of a premises is control."), *reh'g denied, trans. denied*).

█ In the Contract, Jackson and Smith memorialized the duties each owed to the other. Accordingly, the Contract would govern the resolution of any dispute between them, including indemnification.[5] Here, however, a third party claims that Jackson actually did exercise control, for purposes of tort liability, regardless of Contract's terms. The fact of a land-sale contract is not itself dispositive as to the vendor's non-liability. *See Marsden*, 385 N.E.2d at 530. The distinction lies in what the Contract provided versus what actually happened. We must look to both the terms of the Contract and the conduct of the contracting parties to determine who

ee, had a duty to the plaintiff where a fire occurred five weeks after transfer and the evidence supported the conclusion that the installation of a sprinkler system would require ninety days. *Farragher v. City of New York*, 26 A.D.2d 494, 275 N.Y.S.2d 542 (N.Y.App.Div.1966), *aff'd*, 21 N.Y.2d 756, 288 N.Y.S.2d 232, 235 N.E.2d 218 (N.Y.1968). Meanwhile, in *Minaya v. Massachusetts Credit Union Share Insurance,* the Court concluded that an issue of fact existed where the defendant transferred ownership less than one month prior to a fire. *Minaya v. Mass. Credit Union Share Ins.*, 392 Mass. 904, 467 N.E.2d 874 (1984).

5. The duty to indemnify does not arise until the time of payment of the underlying claim, payment of a judgment on the underlying claim, or payment in settlement of the underlying claim. *See Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 757 (Ind.Ct.App. 2002) (citations omitted).

actually exercised control over the Property.

The Contract provided that Smith would make a down payment of $10,000 (less than seventeen percent of the $60,000 purchase price), he would pay $450 per month for two years, and then would face a balloon payment of $43,913.34—or seventy-three percent of the purchase price. The Contract provided that Smith had possession upon execution of the document and that Smith could "treat said real estate as his own with the understanding that [he] shall not commit any waste." App. at 87. Smith could not "construct any improvements on said property without the prior written permission" of Jackson. *Id.* at 87. Therefore, even the terms of the Contract established that Jackson retained some control over the Property. The designated evidence raises questions of fact regarding how much control he exercised.

Moreover, the designated evidence contained in Smith's deposition suggests that he repeatedly deferred to the Jacksons' exercise of authority to approve or reject proposed alterations. In his deposition, Smith stated that he usually asked permission before making improvements "because I felt like that if I done something major they should be aware of it, because technically it was still their property even though I was buying it on contract, and that's the way I felt." *Id.* at 121. His deposition continued:

Q: Did they ever say no, don't do that, or yes, that sounds great, or did they ever respond to what you were saying?

A: A lot of times, sure, I think that'd be all right, Ron [Smith], but sometimes not ... sometimes he and his wife would say well, let us talk about it or whatever. Because I think I was thinking about knocking out a wall or something, and then it didn't come about doing that.

Q: Did they—did they say we really didn't want you to do that, or anything of that nature?

A: *No, they never did really say no. They just said let us talk about it, and then I changed my mind.*

Q: Okay.

A: Which was good.

Q: Did you feel like that you needed their permission to make a change like that?

A: *Yeah. Yes.*

*Id.* at 124 (emphases added). Later, Smith was asked why the tree was removed.

A: Well, there was a rumor a boy got killed, .... And also, it was causing problems with the foundation of the house, pressure, going up, and the limbs were causing a lot of problems with the roof. The wind blows and it goes up and down it rubs up against the siding ....

Q: Did you talk to Mr. Jackson or Mrs. Jackson about removing the tree?

A: Now, this is the part that he and I may disagree upon, I'm not sure, .... I did end up taking the bigger trees out. And before I did, I think I did talk to him about—*I know I did, and I talked to his wife.* One tree requiring a lot of money to have it taken out; the other tree I took down myself—the tree in question. *And I did ask him beforehand.*

Q: So, the tree in question that my clients are contending was an obstruction to people on the sidewalk, you called Mr. Jackson and/or Mrs. Jackson and asked them permission to cut that tree down?

A: *Yeah.* But, can I go—

Q: Sure, go ahead.

A: At first, I stepped on a stepladder and cut limbs off the tree.

Q: Okay.

A: And then the more I thought about it, I said it's still causing problems with the house and the limbs are rubbing, I decided if I'd let them know I'd just like to completely take it down. So, does that answer your question?

Q: Yeah, but did you ask them if you could cut it down, or did you tell them you were going to take it down?

A: I think in this case I just ... I said I'd like to take it down. It's my—Shew. I gotta be honest, I don't—I am being honest, but *I can't put words in their mouth.* All I know is they was aware that it was gonna be taken down. *I don't know if I asked.*

*Id.* at 126–27 (emphases added).

Based upon Smith's deposition, it is not clear whether he merely gave notice or rather sought permission to remove the tree.[6] The Jacksons never affirmatively declined a proposed alteration, but on at least one occasion, they omitted to give authority for a proposed change. "[T]hey never did really say no. They just said let us talk about it, and then I changed my mind." *Id.* at 124. The fact that Smith admitted that he did not know whether he gave notice or sought permission to remove the tree only highlights the ambiguous nature of the contracting parties' oral communications. One could reasonably conclude that Smith interpreted the Jacksons' silence as the lack of approval. Smith's deposition is, at best, equivocal.

The nature of the relationship between Jackson and Smith was further clouded by designated evidence regarding their response to notice of a municipal code violation. Either before or after the effective date of the Contract, Jackson received a certified notice from the City of Columbus regarding tree saplings on the Property. Jackson stated in his deposition that he gave the notice to Smith, who "agreed to remedy it" and did so before the accident. *Id.* at 134. Various inferences can be made from this testimony. Possibly, the parties thought that the Contract required Smith to address the issue. Alternatively, Jackson's use of the word "agreed" may indicate that they did not know whose duty it was to maintain trees on the Property, and after concluding that someone had to act, Smith volunteered to remove the saplings. A third inference could be that Jackson told Smith to address the problem and Smith "agreed to remedy it." Determining what happened is a question of fact, not law.

Meanwhile, Jackson readily acknowledged in his deposition that he and Smith deviated from the precise terms of the Contract. It provided that Smith would carry insurance on the Property, with the Jacksons and Smith being named as insureds. In fact, Jackson kept in place his existing insurance policies on the Property. He paid the premiums and Smith reimbursed him. This meant that Jackson's use of the Property was insured, but that Smith, the person Jackson asserts to have been the only one with control of the Property, had no coverage at all. It is ironic that Jackson seeks to avoid responsibility for the condition of the Property, yet maintained two insurance policies on which he was the sole insured. Combined with the other elements of this case, Jackson's insuring himself, to the exclusion of his vendee, supports the reasonable inference that Jackson controlled the Property.

Jackson also acknowledged in his deposition that he frequently drove by the Property.

**6.** Although the conversation regarding the tree occurred after the accident, that fact is irrelevant to a determination of control.

Q: On a monthly basis, how often would you drive along 7th Street and along this property in 2005?

A: At least a dozen times.

*Id.* at 137. The accident occurred on July 5, 2005, meaning that Jackson would have used 7th Street to drive by the Property at least seventy-two times. Not only was the tree visible, it hung over the very street Jackson was using. It is reasonable to infer that he had observed the condition of the tree.

Finally, we cannot ignore the financial context of the sale. Rather than obtaining a mortgage, Smith entered a land-sale contract in which he put down less than seventeen percent on a $60,000 property. Just two years after execution of the Contract, he had to make a balloon payment of the remaining seventy-three percent. For good reason, the record does not reflect Smith's assets or credit rating. Nonetheless, given the terms of the sale, it was reasonably foreseeable that such a vendee might default. The great majority of the equity in the Property would remain with Jackson throughout the life of the Contract, giving him incentive to monitor and take action to protect his interest. Under these terms, Jackson clearly had a keen interest in the maintenance of the Property during the short period of time until the possibility of repossession was foreclosed. Thus, one can just as easily infer from the terms of the Contract that Jackson retained control sufficient to raise a question of fact concerning his duty as a property owner.

### Conclusion

Control, rather than title, is the critical consideration in determining whether the vendor in a land-sale contract owes a duty to third parties. Whether Jackson exercised the requisite degree of control over the Property is a question of fact. We cannot say as a matter of law that Jackson lacked a duty of care to Travis. Therefore, the trial court erred in granting Jackson's Motion for Summary Judgment. We remand this matter to the trial court for further proceedings.[7]

Reversed and remanded.

VAIDIK, J., concurs.

BAKER, C.J., dissents with opinion.

BAKER, Chief Judge, dissenting.

I respectfully dissent. I do not believe that there is a genuine issue of material fact regarding Jackson's control of the Property. Furthermore, I believe that the result reached by the majority is extraordinarily bad public policy. This decision, which holds that a person who sells a parcel of land pursuant to a contract that explicitly transfers possession of the Property to the buyer and instructs the buyer to treat the Property as his own is somehow still responsible for conditions on that Property, extends liability to an uncomfortably attenuated degree. The majority focuses in part on the fact that Smith's down payment constituted less than 17% of the property's value. Initially, I observe that a 17% down payment is by no means abnormal. Moreover, if Smith's down payment had constituted a greater percentage of the Property's value, would the majority's decision have been different? What if he had made a 25% down payment? 50%? 75%? There is no logical way to draw that line and I do not believe that it is a useful way to analyze these issues.

---

7. Simply determining that a question of fact exists regarding whether Jackson had a duty arising from his control of the premises does not negate Scheible's obligation to also estab-lish that any breach of duty on Jackson's part constituted a proximate cause of Travis' death.

Additionally, the majority quickly dispenses with the terms of the undisputedly valid, binding Contract governing the relationship between Jackson and Smith. Specifically, the majority concludes that "[t]he fact of a land-sale contract is not itself dispositive as to the vendor's liability. The distinction lies in what the Contract provided versus what actually happened." Op. p. 1055. The majority provides no authority in support of these statements and, indeed, I do not believe that the document itself can or should be so easily dismissed.

After the parties executed the Contract, Smith was to "treat [the Property] as his own," subject only to his agreements to avoid committing waste and to receive permission from Jackson before constructing any improvements on the Property. Appellant's App. p. 86–87. The latter two limitations served only to protect Jackson's aforementioned security interest and do not, in and of themselves, suffice to reach a conclusion that Jackson controlled the Property. Thus, the fact that Smith sought Jackson's approval before making improvements to the Property does not establish or create an inference that Jackson was exerting control over the Property.

Even more compelling, the Contract includes the following indemnification provisions:

1. [Smith] hereby assumes all risk and responsibility for accident, injury or damage to person and property arising from [Smith's] use and control of the real estate....

2. Regardless of whether or not separate, several, joint or concurrent liability may be imposed upon [Jackson, Smith] shall indemnify and hold harmless [Jackson] from and against all damages, claims and liability arising from or connected with [Smith's] control or use of the real estate, including, without limitation, any damage or injury to person or property.... If [Jackson] without fault shall become a party to litigation commenced ... against [Smith], then [Smith] shall indemnify and hold [Jackson] harmless....

*Id.* at 90–91. These provisions establish the parties' clear intent that Smith would be in control of the Property and responsible for any damages stemming from his use thereof.

Furthermore, I cannot agree that evidence regarding the municipal code violation creates a genuine issue of fact. The City sent Jackson a notice regarding certain trees on the Property that needed to be trimmed near the end of 2004. The parties executed the contract on December 31, 2004, after which time Jackson sent the notice to Smith, which was the only possible course of action Jackson could have taken, inasmuch as he had no right to enter the Property without Smith's permission and it was Smith's responsibility to treat the Property as his own. That Smith "agreed," appellant's app. p. 134, to trim the trees in no way suggests that Jackson was exercising control over the Property. It merely reveals that Jackson transmitted the City's notice to Smith, who agreed to fulfill his contractual obligation by maintaining the Property.

Moreover, I do not agree that Smith's decision to retain Jackson's property insurance policies and Jackson's agreement to act as a conduit for Smith's premium payments create an issue of fact regarding Jackson's control of the Property. The undisputed evidence establishes that Smith decided to keep the policies in place after the execution of the Contract because Jackson was satisfied with the insurance coverage. There is *no* indication in the record that the policies were maintained so that Jackson could retain control over the

Property. There is not an iota of support for the majority's conclusion that the parties' insurance-related decisions create an issue of fact regarding Jackson's control over the Property.

Finally, the majority notes the frequency with which Jackson drove past the Property, neglecting to mention the undisputed evidence in the record that the only reason Jackson drove by the Property was because his family owned the adjacent lot. There is not one bit of designated evidence supporting a conclusion that Jackson's drives past the Property had anything whatsoever to do with his relationship to the Property. That the tree on the Property was visible to Jackson when he drove past is beside the point—the question is whether, having seen the tree, he had any legal obligation to remedy the situation. I do not believe that he did. Given that he had sold the Property, that Smith was to treat the Property as his own, that Smith had agreed to assume all risk of ownership, and that nothing in the record establishes that Jackson asserted any control over the Property, I conclude that there is no question of material fact regarding Jackson's liability as an owner or mortgagee of the Property. Thus, I would affirm the trial court.