# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**TODD A. RICHARDSON**
**JOSEPH P. ROMPALA**
Lewis & Kappes, P.C.
Indianapolis, Indiana

**R.T. GREEN**
Blackburn & Green
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**PAUL V. ESPOSITO**
Clausen Miller PC
Chicago, Illinois

**MATTHEW R. SHIPMAN**
Bloom Gates & Whiteleather, LLP
Columbia City, Indiana

**FILED**

May 31 2013, 9:25 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| LINDA HUFFMAN, Individually and as Personal Representative of the Estate of Jerry Huffman, Deceased, | ) ) ) ) |
| Appellant/Plaintiff, | ) ) |
| vs. | ) No. 85A02-1207-CT-586 |
| | ) |
| DEXTER AXLE COMPANY, | ) ) |
| Appellee/Defendant, | ) ) |
| & | ) ) |
| EVANS EQUIPMENT COPMANY, | ) ) |
| Appellee/Third-Party Defendant. | ) |

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen, III, Judge
Cause No. 85C01-0707-CT-371

**May 31, 2013**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

Linda Huffman ("Linda"), individually and as the Personal Representative of the Estate of Jerry Huffman ("Huffman"), appeals the trial court's grant of summary judgment to Dexter Axle Company ("Dexter") on Linda's claim of negligence.

We reverse and remand for further proceedings.[1]

ISSUE

Whether summary judgment was properly granted to Dexter.

FACTS

Dexter manufactures axles for mobile homes. Dexter's axles are transported to their customers by commercial truck. Dexter employs its own truck drivers as well as independent trucking companies to deliver its axles. Dexter retained Evans Equipment Company ("Evans"), Huffman's employer, to deliver axles. Before shipping axles, Dexter banded together a number of axles to create "bundles"; these bundles were then loaded onto flatbed trailers by Dexter forklift operators. The banding around the axles did not connect the bundles to the trailers. To connect or secure the axles to the trailers, Dexter employees or the truck drivers placed additional straps around the axles.

---

[1] The court heard oral argument on May 2, 2013. We thank counsel for both parties for their able presentations.

The trailers were loaded by either the "drop-and-hook" or the "live-load" method. Using the "drop-and-hook" method, a truck driver left an empty trailer at Dexter's facility for loading at a later time. Upon the truck driver's return, the driver hooked his truck to the loaded trailer. If the "live-load" method was used, a driver's trailer remained hooked to the tractor as axles were loaded. With "live loads," Dexter employees or the truck driver strapped axles to the trailer as the axles were loaded. For "drop-and-hook" loads, Dexter strapped approximately 95% of the loads hauled by outside carriers.

During the first couple of years that Dexter used Evans to deliver its axles, Evans used the "live load" method. However, Evans subsequently switched to the "drop-and-hook" method. Drivers left straps with the trailer, and Dexter secured the axles to the trailer. However, because Evans's drivers began losing straps left at other facilities, Evans decided to no longer leave straps with dropped trailers, including trailers left with Dexter.

Within a couple of months of the changed procedure, a Dexter employee asked Evans to leave one set of straps with Dexter. Those straps would be used for the next Evans load, and the Evans driver picking up the load would leave his own straps for a future load. Evans initially adopted Dexter's suggestion. Ultimately, Evans abandoned the procedure, and Dexter stopped strapping dropped trailers delivered by Evans.

On Sunday, March 12, 2006, Huffman arrived at a Dexter facility located in North Manchester, Indiana, to pick up a flatbed trailer loaded with axles. Dexter was not open for business and no one else was at the facility. However, Huffman, as well as other truck drivers, had access to pick up loads. The bundles were stacked in several layers

3

and, consistent with Dexter's practice for Evans's loads, were not strapped or secured to the trailer. Sometime later, another trucker and motorist arrived at the facility and found Huffman lying on the ground next to his truck. A bundle of axles were found on the ground near Huffman and the trailer. The Sheriff's department responded to the scene; Huffman was dead upon their arrival. A coroner determined Huffman's death to be an accident.

On July 17, 2007, Linda filed a complaint against Dexter alleging that Huffman died as a result of Dexter's negligence. On September 14, 2007, Dexter filed its first answer, generally denying the allegations in Linda's complaint. With leave of the trial court, Dexter filed an amended answer, raising as an affirmative defense that Huffman and Evans were the cause of the accident by failing to secure the axles.[2]

On December 13, 2011, Dexter filed a motion for summary judgment, alleging that it owed no duty to Huffman and that Huffman had been responsible for the injuries which caused his death. On February 10, 2012, Linda filed a response asserting that Dexter owed a duty to Huffman as a business invitee and designated evidence that Dexter violated Occupational Safety and Health Administration ("OSHA") regulations when loading the axles in question. Linda also alleged that the remaining issues of causation and comparative fault were questions for the fact-finder to determine.

On March 28, 2012, Dexter filed a reply, designating additional evidence arguing that it owed no duty to Huffman. Dexter also argued that OSHA regulations were inapplicable and that any duty Dexter owed was extinguished when Evans requested that

---

[2] Dexter filed a Third Party Complaint against Evans asserting that Evans owed a contractual duty to indemnify Dexter in Huffman's lawsuit. The Third Party Complaint is pending before the trial court.

Dexter not secure loads that were to be picked up by Evans's drivers. On April 12, 2012, Linda filed a reply addressing the points raised by Dexter's March 28th filing. Specifically, Linda reemphasized her argument that Dexter owed Huffman a duty and claimed that Dexter could not disregard its duty to comply with OSHA regulations by arguing that it and Evans agreed not to strap the axles onto the trailer.

On June 20, 2012, the trial court issued a general order granting Dexter's motion for summary judgment and dismissed Linda's complaint against Dexter. On July 20, 2012, Linda filed a notice of appeal, explaining that the trial court's June 20th order did not resolve all claims against all parties and was not certified as final. Linda requested that the trial court certify the order as final for the purposes of appeal. The trial court did so on July 31, 2012, entering final judgment in favor of Dexter. Thereafter, Linda filed a supplemental notice of appeal.

## DECISION

When reviewing a trial court's order granting summary judgment, we apply the same standard used in the trial court. *Kopczynski v. Barger*, 887 N.E.2d 928, 930 (Ind. 2008). Summary judgment is appropriate only where the designated evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). "All facts and reasonable inferences drawn from [the designated evidence] are construed in favor of the non-moving party." *Gunkel v. Renovations*, 822 N.E.2d 150, 152 (Ind. 2005). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth . . . , or if

5

the undisputed facts support conflicting reasonable inferences." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (internal citations omitted).

"To prevail on a theory of negligence, a plaintiff must prove: (1) that the defendant owed plaintiff a duty; (2) that it breached the duty; and (3) that plaintiff's injury was proximately caused by the breach." *Winfrey v. NLMP, Inc.*, 963 N.E.2d 609, 612 (Ind. Ct. App. 2012). Summary judgment is rarely appropriate in negligence cases. *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004). "This is because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." *Id.* "However, a defendant may obtain summary judgment in a negligence action when the undisputed facts negate at least one element of the plaintiff's claim." *Pelak v. Indiana Indus. Servs., Inc.*, 831 N.E.2d 765, 769 (Ind. Ct. App. 2005), *trans. denied*.

A trial court's grant of summary judgment is "clothed with a presumption of validity" and an appellant has the burden of demonstrating that the grant of summary judgment was erroneous. *Williams*, 914 N.E.2d at 762. In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the designated evidence. *SMDfund, Inc. v. Fort Wayne–Allen Cnty. Airport Authority*, 831 N.E.2d 725, 728 (Ind. 2005), *cert. denied*. Yet, appellate courts must carefully review a trial court's grant of summary judgment so as not to improperly deny a party his/her day in court. *Gunkel*, 822 N.E.2d at 152.

We address Linda's arguments opposing summary judgment separately.

A. Duty Owed to Huffman

6

Linda asserts that on the day of the accident, Huffman was a business invitee, and, therefore, Dexter owed a duty to exercise reasonable care for Huffman's protection while at Dexter's facility. Dexter counters that it was not negligent under the theory of premises liability because no natural condition on the land caused the accident, and Dexter did not control the premises at the time of the accident. Further, Dexter argues that Huffman's duty to secure the load extinguished Dexter's general duty as a landowner and that Evans's instructions to stack the axles without straps, in combination with Huffman's activity around the trailer, caused the accident and Huffman's subsequent death.

In deciding whether Dexter owed a duty to Huffman, it is important to determine Huffman's status when he entered Dexter's property on the day of the accident. When a person enters upon the land of another, he enters as an invitee, a licensee, or a trespasser. *Rhoades v. Heritage Investments, LLC*, 839 N.E.2d 788, 791 (Ind. Ct. App. 2005), *trans. denied*. "The person's status on the land defines the nature of the duty owed by the landowner to the visitor." *Id*. "A landowner owes the highest duty of care to an invitee, that duty being to exercise reasonable care for the invitee's protection while he is on the premises." *Id*.

To determine whether a person is an invitee, our Supreme Court, in the case of *Burrell v. Meads*, 569 N.E.2d 637 (Ind. 1991), adopted the invitation test described in the Restatement (Second) of Torts § 332. There, an invitee is defined as follows:

An invitee is either a public invitee or a business visitor.

7

> (1) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.
>
> (2) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

*Burrell*, 569 N.E.2d at 642.[3]

While the determination of the duty owed by a landowner is ordinarily a question of law for the court to decide, "it may turn on factual issues that must be resolved by the trier of fact." *Kopczynski*, 887 N.E.2d at 931. In premises liability cases, "whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred. *Rhodes*, 805 N.E.2d at 385. The rationale is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm." *Id*. Yet, a defendant who has relinquished control of the premises may still owe a duty if it is found that the defendant was in a better position to prevent any potential harm. *Beta Steel v. Rust*, 830 N.E.2d 62, 71 (Ind. Ct. App. 2005). "Possession and control of property for premises liability purposes has been described as a question of fact involving occupation and intent to control the particular area where the injury occurred." *Id*. at 70.

In this case, Dexter hired Evans to transport axles to Dexter customers. As an Evans employee tasked to haul Dexter axles, the law clearly places Huffman in the category of a business visitor. Thus, Dexter's duty as a landowner was to exercise reasonable care for Huffman's protection while at Dexter's property. *See Burrell*, 569

---

[3] *Burrell* also held that social guests qualify as invitees. Here, there is no dispute; Huffman was not a social guest of Dexter.

N.E.2d at 639. While Dexter may not have the duty of an employer to provide a safe workplace for Huffman, our case law is clear that Dexter did owe Huffman "an affirmative duty to exercise ordinary care to keep [its] property in a reasonably safe condition coextensive with the purpose and intent of the invitation." *See Beta*, 830 N.E.2d at 70.

Dexter argues that it was not in control of its property at the time of the accident because it was not open for business. However, it designated no evidence supporting its position that it effectively relinquished control of its property to Huffman or Evans, nor has Dexter cited any Indiana law supporting its position that Huffman's responsibility for his cargo extinguishes Dexter's tort duty. The fact that Dexter left its property open when no Dexter employee would be on the premises, knowing that Huffman would enter and obtain the load, is further evidence that Dexter did not ultimately release control of the property. Because of this, Dexter's citation to *McCole v. Industrial Finishing Technologies, Inc.*, 2011 WL 1600510, an unpublished decision from Michigan's Court of Appeals, does not support its assertion.[4] Moreover, even if *McCole* were noticeable before this Court, the ultimate holding concerned whether the defendant had notice of an unreasonable open and obvious danger on its property, not whether a duty existed. Dexter also relies on two Illinois cases; *Jackson v. Hilton Hotels Corp.*, 660 N.E.2d 222

---

[4] Michigan Rule of Court 7.215(C)(1) states that, "an unpublished opinion is not precedentially binding under the rule of stare decisis."

(Ill. App. 1995) and *Burse v. CR Industries, Inc.*, 680 N.E.2d 431 (Ill. App. 1997). Again, neither case controls on the question of duty under Indiana law.[5]

As to Dexter's argument that no natural condition on the land caused the accident, Dexter again cites no authority for this proposition and even acknowledges that in Indiana, premises liability may arise from activities on the land. (Dexter's Br. 17). Here, the activity is the manner in which axles were loaded and stored for trailers dropped off by Evans. Dexter claims that it simply agreed to abide by Evans's decision not to provide straps, thereby relieving Dexter of any duty to secure the axles to the trailer. However, Indiana law is clear; "[a] person cannot limit his or her tort duty to third parties by contract." *See Rhodes*, 805 N.E.2d at 385; *Young v. Tri-Etch, Inc.*, 790 N.E.2d 456, 459 (Ind. 2003); *Morris v. McDonald's Corp.*, 650 N.E.2d 1219, 1221-23 (Ind. Ct. App. 1995) (plaintiff injured at a franchised McDonald's restaurant could sue McDonald's despite waiver and indemnity clauses in contract between McDonalds's and franchise operator because injured plaintiff was not a party to that contract). Accordingly, we hold, as a matter of law, that Dexter owed a duty to Huffman.

B. Breach of Duty

Linda claims that there is a genuine issue of material fact regarding whether Dexter breached its duty of care by violating OSHA safety regulations. Specifically, Linda points to OSHA regulation 29 C.F.R. § 1910.176(b), incorporated in Indiana by 29

---

[5] Additionally, the Illinois Supreme Court expressly disapproved both cases in *LaFever v. Kemlite Co., a Div. of Dyrotech Industries, Inc.*, 706 N.E.2d 441, 448-50 (Ill. 1998).

C.F.R. § 1952.320(a)(2).[6]  29 C.F.R. § 1910.176(b) states the following: "Storage of material shall not create a hazard.  Bags, containers, bundles, etc., stored in tiers shall be stacked, blocked, interlocked and limited in height so that they are stable and secure against sliding or collapse." "Violation of an administrative regulation can be considered evidence of negligence, though it is not evidence per se." *Beta*, 830 N.E.2d at 73-74 (citing *Zimmerman v. Moore*, 441 N.E.2d 690, 696 (Ind. Ct. App. 1982)).

Dexter responds that the OSHA regulations in question do not apply in this case because they are preempted by regulations of the Department of Transportation ("DOT"). Specifically, Dexter argues that regulations promulgated under the Motor Carrier Safety Act preempts OSHA regulations according to section 4(b)(1) of the Occupational Safety and Health Act ("OSH Act") of 1970.  Section 4(b)(1) provides that:

> Nothing in this Act shall apply to working conditions of employees with respect to which other Federal agencies, and State agencies acting under section 2021 of Title 42, exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.

29 U.S.C. § 653(b)(1).   In support, Dexter cites Federal Motor Carrier Safety Administration regulation 49 C.F.R. § 383.111(a)(16) requiring truck drivers to have knowledge of the principles and procedures for the proper handling of cargo.  Dexter also contends that language in the OSHA regulation regarding the "storage of material" does not include temporary storage, but covers long term or permanent storage of items.

Dexter claims that DOT regulations expressly preempt OSHA regulations per section 4(b)(1) of the OSH Act.  Express preemption occurs when a federal statute

---

[6] This subsection states, in relevant part, that "Indiana has adopted all Federal safety and health standards contained in 29 CFR parts 1910 and 1926."

11

contains specific language of preemption.[7] *Basileh v. Alghusain*, 912 N.E.2d 814, 818 (Ind. 2009) However, several District and Circuit Courts of Appeal within the Second, Fourth, Fifth, Seventh, and District of Columbia circuits have issued opinions that reject Dexter's assertion. It is generally recognized that the purpose of this statutory provision is to "reduce regulatory overlap among agencies by divesting OSHA of regulatory authority when another agency is better qualified to regulate in a particular area." *Miller v. Chicago and North Western Transp. Co.*, 925 F.Supp 583, 586 (N.D. Ill. 1996). However, it is also clear "that Congress attached great importance to the safety and health protections of employees afforded by OSHA and, in particular, to the desirability of bringing those protections to bear upon employees generally as fast as possible." *Baltimore & O.R. Co. v. Occupational Safety and Health Review Comm.*, 548 F.2d 1052, 1054 (D.C. Cir. 1976); *see also Southern Ry. Co. v. Occupational Safety and Health Review Comm*, 539 F.2d 335 (4th Cir. 1976), *cert. denied*, 97 S.Ct. 525 (1976); *Southern Pacific Transp. Co. v. Usery*, 539 F.2d 386 (5th Cir. 1976). "Employees should not lightly be denied the protection of OSHA for, as the Senate Report accompanying the Act noted, [t]he problem of assuring safe and healthful workplaces for our working men and women ranks in importance with any that engages the national attention today." *Marshall v. Northwest Orient Airlines, Inc.*, 574 F.2d 119, 122 (2nd Cir. 1978) (internal quotations and citation omitted). In addition, Congress did not intend to preempt

---

[7] There are two other types of federal preemption. Field preemption occurs when federal regulations are so pervasive that it is reasonable to infer that Congress intended exclusive federal regulation of a particular area. *Basileh*, 912 N.E.2d at 818. Conflict preemption occurs when a direct conflict makes it impossible to comply with both federal and state regulations. *Id*. Conflict preemption may also occur when a state law stands as an obstacle to the execution of federal purposes and objectives. *Id*. Neither field nor conflict preemption applies in this case.

12

OSHA's jurisdiction based on hypothetical conflicts. *Id*. Therefore, "a sister agency must *actually* be exercising a power to regulate safety conditions in order to preempt OSHA." *Id*. (emphasis added).

This interpretation of section 4(b)(1) was upheld by the United States Supreme Court in *Chao v. Mallard Bay Drilling, Inc*. 534 U.S. 235 (2002). In *Chao*, the Supreme Court reversed a Fifth Circuit Court of Appeals decision holding that Coast Guard regulations concerning working conditions of seamen aboard certain vessels precluded OSHA regulations. In discussing Congress' intent behind section 4(b)(1) of the OSH Act, the Court held that mere existence of another agency's authority to regulate areas covered by OSHA is not sufficient for preemption. *Id*. at 241. The Court further stated that, "OSHA is only pre-empted if the working conditions at issue are the particular ones 'with respect to which' another federal agency has regulated, and if such regulations 'affec[t] occupational safety or health.'" *Id*. (quoting 29 U.S.C.A. § 653(b)(1)). Comparing the exercise of regulatory authority between the Coast Guard and OSHA, the Court determined that OSHA regulations were not preempted. *Id*.

More closely related to the facts of this case is *Bean v. CSX Transp.*, 289 F.Supp.2d 277 (N.D.N.Y. 2003). In that case, a federal District Court in the Northern District of New York compared the exercise of regulatory authority between OSHA and DOT. Bean was employed by railroad owner CSX to maintain and repair signal devices. In order to perform these repairs, he used a Freightliner boom truck, consisting of a flatbed and crane used to lift and suspend heavy objects into the air. After completing a job, Bean began climbing down from the flatbed using handrails and steps on the truck.

Missing a step, Bean fell and injured himself. OSHA had issued regulations regarding the workplace, but the DOT had also issued regulations concerning commercial motor vehicles. At trial, the jury heard expert testimony and received instructions, over CSX's objections, regarding only OSHA's workplace safety regulations. In addition, the District Court did not allow the jury to consider CSX's expert testimony regarding DOT regulations.

In reaching its decision, the District Court found that the DOT authorizing statute and regulations did not specifically cover the boom trucks. *Id.* at 283. In addition, the court found that the purpose of DOT regulations was to enhance safety in the actual transportation of passengers and property in interstate commerce, and that the purpose of OSHA regulations was to enhance safety at work sites. *Id.* For these reasons, section 4(b)(1) of the OSH Act did not preempt OSHA's regulations.

Here, the DOT regulation Dexter relies on for preemption of OSHA requires that truck drivers possess knowledge concerning the relationship of cargo to the safe operation of commercial motor vehicles. However, the regulation is part of a regulatory scheme requiring all States to test a driver's knowledge before granting a commercial motor vehicle endorsement. *See* 49 C.F.R. § 383.110. The purpose of this regulatory scheme "is to help reduce or prevent truck or bus accidents, fatalities, and injuries by requiring drivers to have a single commercial motor vehicle driver's license and by disqualifying drivers who operate motor vehicles in an unsafe manner." 49 C.F.R. § 383.1(a). An "accident" is defined as "an occurrence involving a commercial motor vehicle operating on a highway in interstate or intrastate commerce" which results in a

14

fatality, bodily injury, or disabling vehicle damage. 49 C.F.R. § 390.5(1)(i)-(iii). An "accident" does not include an "occurrence involving only the loading or unloading of cargo." 49 C.F.R. § 390.5(2)(ii). In addition, there are no cases where this regulation has been used to support a preemption claim to avoid an alleged violation of OSHA regulations. Violations of this particular DOT regulation have been used in attempts to support a claim of negligent retention of a truck driver against an employer. *See Morris v. JTM Materials, Inc*., 78 S.W.3d 28 (Tex. App. 2002) (employer has duty to ensure qualifications and competence of employees it hires); *Guidry v. National Freight, Inc.*, 944 S.W.2d 807 (Tex. App. 1997) (purpose of regulatory duty imposed on employers of truck drivers to take steps to prevent injury to driving public by determining competency of job applicant is to promote highway safety and prevent accidents, not prevent general criminal activity). Because Dexter does not cite to any actual DOT regulations imposing obligations regarding loading or unloading of cargo, we hold that DOT regulations do not preempt OSHA regulations in this case.

Finally, Dexter asserts that even if OSHA regulations are not preempted, the word "storage" as used in 29 C.F.R. § 1910.176(b) was not intended to mean temporary storage on a loading dock. However, the term "storage" applies more broadly and is "not limited to stacking operations in areas of permanent storage." *Noranda Aluminum, Inc. v. Occupational Safety and Health Review Comm.*, 593 F.2d 811, 814 (8th Cir. 1979), *rehearing and rehearing en banc denied*.

Having held that DOT regulations in this case do not preempt the regulatory authority of OSHA, we find that Linda has designated evidence that could establish

15

Dexter violated OSHA regulations, and thus, breached its duty to Huffman. Several Dexter employees testified during depositions that axles loaded onto Evans's dropped trailers were securely strapped together. However, this process stopped when Evans decided to no longer leave straps with dropped trailers. It is undisputed that the axles loaded for Huffman to pick up were not strapped to the trailer, but it is unclear from the designated evidence how the axles came to fall onto Huffman. These facts, combined with the existence of an OSHA regulation that might be applicable to the storage of the axles, demonstrates the existence of a genuine issue of material fact regarding the breach of duty.

C. Injury Proximately Caused by Breach & Comparative Fault

Linda argues that given "the uncertainties surrounding the precise circumstances of Huffman's death, which occurred in the absence of any witnesses, it is for the jury to determine what role Dexter's negligence played along with any other factors in the chain of causation." (Linda's Br. 23). Dexter maintains that this Court need not consider proximate cause because Linda failed to establish Dexter owed a duty to Huffman. Dexter does present some argument on Huffman's possible contributory negligence, albeit while trying to establish that Dexter owed no duty to Huffman.

A parties' action or omission is the proximate cause of an injury when "'the ultimate injury [is] one that was foreseen, or reasonably should have been foreseen, as the natural and probable consequence of the act or omission.'" *Vernon v. Kroger Co.*, 712 N.E.2d 976, 981 (Ind. 1999) (quoting *Havert v. Caldwell*, 452 N.E.2d 154, 158 (Ind. 1983)). The question of proximate cause is usually left to the jury. *Id.*

16

As mentioned previously, there were no witnesses to this accident. However, Dexter employees and experts retained by both parties stated during depositions that if the axles were strapped to the trailer in question, the axles would not have fallen and Huffman would not have died. Dexter argues that Huffman and Evans share the blame for the accident. Dexter alleges that Huffman was negligent in the manner in which he attempted to secure the axles to the trailer, and Evans is at fault for not providing Dexter with straps to secure the axles. As to Huffman's actions, most of the witnesses agree that Huffman should not have hooked up his truck to the trailer prior to securing the axles. However, Indiana OSHA investigator Jerry Marquell and Linda's expert witness, Brooks Rugemer, testified that there was no physical evidence that Huffman dislodged the axles when he connected the truck. As to Evans not providing straps, Dexter employees testified that they contacted Evans and convinced them to leave a set of straps at Dexter's facility. The Dexter employees stated that they made this request because it was more efficient and safer to strap the axles to the trailer as they were loaded. As a result, there is a genuine issue of material fact regarding proximate causation and comparative fault.[8]

As a matter of law, Dexter owed a duty to Huffman on the day of the accident. Genuine issues of material fact exist as to the remaining elements of Linda's claim. We reverse and remand this case to the trial court for further proceedings.

Reversed and remanded.

ROBB, C.J., Concur.

MAY, J., Concur in result with opinion.

---

[8] *See* Ind. Code § 34-51-2-7.

17

# IN THE
# COURT OF APPEALS OF INDIANA

LINDA HUFFMAN, Individually and as )
Personal Representative of the Estate of )
Jerry Huffman, Deceased, )
         )
      Appellant-Plaintiff, )
         )
      vs. )     No. 85A02-1207-CT-586
         )
DEXTER AXLE COMPANY, )
         )
      Appellee-Defendant )
         )
      and )
         )
EVANS EQUIPMENT COMPANY, )
         )
      Appellee-Third-Party Defendant. )

**MAY, Judge, concurring in result**

I agree we should reverse summary judgment for Dexter for the reasons the majority states: Dexter owed Huffman, its invitee, a duty and there are fact issues as to breach and proximate cause. However, I believe it is unnecessary, and therefore inappropriate, to address OSHA regulations, DOT regulations, the interpretation and application of those regulations, preemption, and congressional intent in this relatively straightforward premises liability case.

As Huffman was an invitee, Dexter owed him a duty to exercise reasonable care for Huffman's protection while Huffman was on Dexter's premises. The majority correctly reaches this conclusion about duty without analysis, or even mention, of OSHA

18

or DOT regulations. But it then relies on those regulations as a basis for its determination there is a factual issue as to breach, even though the duty that might have been breached apparently does not arise from those regulations.

Whether the axles should have been strapped together for safe loading presents an issue of fact as to breach of duty, which precludes summary judgment regardless of whether any federal regulation applies. Nothing more needs to be said about that, and reaching that conclusion does not require an analysis of the meaning, relative authority, or application of OSHA or DOT regulations. The OSHA/DOT discussion is therefore *dicta.*

"As with diamonds, the principal difficulty in overly broad holdings is inclusions - - clouding what should be clear statements of the holding with other assertions that should instead have been treated as *dicta.*" Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1017 (2005). It is a basic rule of jurisprudence that courts decide only so much as is necessary to resolve the cases before them. *Pointon v. State*, 267 Ind. 624, 630, 372 N.E.2d 1159, 1162 (1978) (DeBruler, J., concurring). "Too much *dicta* leads to confusion, and requires too much subsequent explanation." *McArter v. Rhea*, 30 S.E. 128, 129 (N.C. 1898). I can accordingly concur only in the result.